**FRANKLIN FEDERAL SAVINGS BANK,** Franklin Financial Group, Inc., George O. Haggard, Jr., Ben B. Jarnagin, Richard C. Jessee, A. Eugene Jolley, Jean S. Keener, George R. McGuffin, and Charles G. Robinette, Plaintiffs,

v.

**The UNITED STATES, Defendant.**

No. 92–739–C.

United States Court of Federal Claims.

Sept. 5, 2002.

Thomas R. Dyer, Memphis, Tennessee, attorney of record for plaintiffs Franklin Federal Savings Bank and Franklin Financial Group, Inc.

Thomas M. Buchanan, Washington, D.C., attorney of record for the individual plaintiffs.

Glenn I. Chernigoff, Trial Attorney, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant.

## OPINION

LYDON, Senior Judge.

This is a *Winstar*-related case. The plaintiffs allege that they entered into a contract with the United States under which Franklin Financial Group, Inc., a thrift holding company, acquired a failing thrift in eastern Tennessee called Morristown Federal Savings & Loan Association. As part of the contract, plaintiffs assert, the Government promised that the new institution, renamed Franklin Federal Savings Bank, could treat the deficit net worth of Morristown Federal Savings & Loan Association as an intangible asset for purposes of calculating the new thrift's regulatory capital and satisfying its minimum regulatory capital requirements. This intangible asset, called supervisory goodwill, was to be amortized on a straight-line basis over 25 years. In accordance with the Supreme Court's holding in *United States v. Winstar Corporation et al. ("Winstar III")*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the plaintiffs contend that this "goodwill contract" was breached by the Government through the enactment of legislation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), P.L. No. 101–73, 103 Stat. 183, which essentially eliminated supervisory goodwill from thrift institutions' regulatory capital. The plaintiffs have filed an omnibus motion for summary judgment on their breach of contract claim. They seek reliance and so-called "wounded bank" damages as a matter of law, while reserving the right to pursue additional damages theories at trial.

The Government has filed a motion to dismiss this claim for lack of a binding contract or, in the alternative, a motion for summary judgment. The Government's basic stance is that there was no contract between the plaintiffs and the United States promising that Franklin Federal Savings Bank could treat supervisory goodwill as an asset, amortizable over 25 years, for the purposes of satisfying regulatory capital requirements. As grounds for this position, the Government argues that

the federal officials with whom the plaintiffs dealt in converting Morristown Federal Savings & Loan Association into Franklin Federal Savings Bank did not have authority to enter into the alleged "goodwill contract," and that the instruments involved in that transaction indicate only a regulatory approval, not the formation of a contract. Even if the instruments in question are viewed as establishing a "goodwill contract," the Government argues, the language therein expressly placed the risk of regulatory change (with respect to the treatment of supervisory goodwill) on the plaintiffs. In addition, the Government contends that the individual plaintiffs illegally assigned some of the ownership rights in their claims, in violation of the Assignment of Claims Act, 31 U.S.C. § 3727(a) & (b), and that the thrift, Franklin Federal Savings Bank, is the only plaintiff with standing in this case. Lastly, the Government argues that the plaintiffs' damages claims fail as a matter of law.

The case is before the court on the issue of liability. Based on the parties' briefs and oral presentations, the court finds that there was a "goodwill contract" and that this contract was breached by the enactment FIRREA in 1989. Accordingly, the plaintiffs' omnibus motion for summary judgment on the issue of liability is granted. The Government's motion to dismiss the claim, and the alternative motion for summary judgment as to liability, are denied.

### FACTUAL BACKGROUND

Morristown Federal Savings and Loan Association ("Morristown") was chartered as a federal mutual savings association in 1935. Its main office was in Morristown, Tennessee, and three branch offices were opened over the years in eastern Tennessee. Morristown had an asset base consisting primarily of fixed-rate, single-family mortgages, consumer and commercial loans, as well as U.S. government and other investment securities. Its liability base consisted of passbook savings accounts, money-market accounts, and certificates of deposit.

As the Supreme Court noted in *Winstar III, supra* "[T]he combination of high interest rates and inflation in the late 1970's and early 1980's brought about a . . . . crisis in the thrift industry. Many thrifts found themselves holding long-term, fixed-rate mortgages created when interest rates were low; when market rates rose, those institutions had to raise the rates they paid to depositors in order to attract funds." 518 U.S. at 844, 116 S.Ct. 2432. The magnitude of the thrift crisis threatened the solvency of the Federal Savings and Loan Insurance Corporation ("FSLIC"), which insured all thrift deposits up to $100,000 and faced enormous liability when thrifts went bankrupt and were liquidated.[1] In response to the crisis, the Federal Home Loan Bank Board ("Bank Board"), as the FLSIC's operating head, "chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.' [T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." *Id.* at 847–48, 116 S.Ct. 2432. In particular, the understanding permitted acquiring thrifts to use the "pushdown method" of accounting which "permit[ted] the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called goodwill.' Goodwill recognized . . . . as the result of an FSLIC-sponsored supervisory merger was generally referred to as 'supervisory goodwill.'" *Id.* at 848–49, 116 S.Ct. 2432.

Like many other thrifts, Morristown was caught in the vortex of the thrift crisis. The institution, whose assets totaled about $100 million, incurred net losses after taxes of $271,315 in 1983 and $479,097 in 1984. After rebounding to record net profits after taxes and extraordinary items of $422,510 in 1985

---

1. "By 1988," as the Supreme Court noted in *Winstar*, " . . . . FSLIC was itself insolvent by over $50 billion [citing a House of Representatives report]. And by early 1989, the GAO estimated that $85 billion would be needed to cover FSLIC's responsibilities and put it back on the road to fiscal health." 518 U.S. at 847, 116 S.Ct. 2432.

and $898,403 in 1986, Morristown's fortunes declined once again. In 1987 it suffered net losses after taxes of $1,038,350, and in 1988 its net losses after taxes climbed to $1,728,890. At the end of 1987, according to the thrift's auditors, Morristown had a negative net worth of $3.536 million. In response to Morristown's deterioration, the thrift's primary regulators at the Bank Board's Cincinnati, Ohio office recommended by letter in December 1987 that Morristown's board of directors seek to merge with another thrift in Tennessee.

Morristown had twice previously sought approval from the Bank Board's Cincinnati office for a "voluntary supervisory conversion" from a federal mutual savings and loan association into a federal stock savings bank. In January 1984 Morristown's board of directors had formed Franklin Financial Group, Inc. ("Franklin Financial") to serve as a savings and loan holding company for the purpose of acquiring the capital stock of Morristown. Franklin Financial had no other business. Morristown applied for a voluntary supervisory conversion in March 1984 and again in July 1987, but failed both times to obtain the Bank Board's approval.

On March 21, 1988, Morristown entered into a three-year employment contract with Charles G. Robinette under which Robinette began serving as president and chief executive officer of the thrift and joined the board of directors. The contract granted Robinette an option to purchase up to 4 % of Morristown's outstanding shares at the initial supervisory conversion offering price. The option had to be exercised by the final date of the employment contract—March 20, 1991. In July 1988 the employment contract was replaced by a new agreement signed by Robinette, Morristown, and Franklin Financial, which retained the same stock option provision.

Following Robinette's retention as president and CEO, Morristown embarked on a third attempt to convert from a mutual association to a stock company. Morristown prepared a business plan in May 1988 proposing that 100 % of the new institution's common stock be issued to Franklin Financial. The owners of Franklin Financial were to be four

of Morristown's directors—plaintiffs Jean S. Keener (chairman of the board), Richard C. Jessee, George R. McGuffin, and Charles G. Robinette (president and CEO)—as well as three local investors—plaintiffs George O. Haggard, Jr., Ben B. Jarnagin, and A. Eugene Jolley. Thus, the supervisory conversion of Morristown was to be accomplished with capital contributions from a combination of current Morristown directors and outside investors (the "Seven Shareholders"). The business plan provided that Franklin Financial (i.e., its Seven Shareholders) would pay $5 million in cash to the new thrift in exchange for its common stock. The cash was to be raised by Franklin Financial and its shareholders through a commercial loan. That debt obligation was to be serviced by Franklin Financial and its shareholders with quarterly dividends received from the new thrift. These dividend payments could be made by the thrift as long as it was in compliance with federal net worth requirements.

The business plan proposed that the new thrift use the purchase method of accounting. Use of the purchase method would allow the new thrift to place goodwill and certain other unidentifiable intangibles on its balance sheet as assets. The "pro forma" balance sheet submitted with the business plan outlined push-down accounting adjustments totaling $8.673 million. This figure included a revaluation of certain fixed assets equal to $1.444 million, "identifiable intangibles" of $3.041 million ($2.661 million for the value of the thrift's core deposit base and $380,000 for the value of its mortgage loan servicing rights), and $3.807 million in goodwill (to account for the then-estimated excess liabilities of Morristown).

On June 7, 1988, Morristown submitted its application for the supervisory conversion, accompanied by its business plan, to the Bank Board's Cincinnati office. By November 1988 the proposed transaction took final form.

On November 21, 1988, the Office of General Counsel (OGC) of the Bank Board's Corporate and Securities Division sent a memorandum to the Bank Board's Office of Regulatory Activities (ORA) indicating its

approval of the supervisory conversion and analyzing the proposed transaction. As explained in the memorandum, Morristown would convert from a mutual association to a stock company, change its name to Franklin Federal, and issue $5 million of common stock to the holding company, Franklin Financial. To finance this purchase, Franklin Financial would sell its own stock to the Seven Shareholders for a total price of $500,000, payable in cash. The other $4.5 million was to be borrowed by Franklin Financial from a local commercial bank (First Tennessee Bank). The loan was to be secured by the personal guarantees and collateral of the Seven Shareholders, thus making them personally responsible for servicing and paying off the debt. In sum, the Seven Shareholders, through Franklin Financial, would infuse a total of $5 million into the new thrift, Franklin Federal.

In its memorandum the OGC stated further that "[t]he only forbearance requested [by the applicants] is to permit the [Franklin Federal] Savings Bank to amortize goodwill over 25 years for Regulatory Accounting Purposes." The OGC referred to Morristown's stated intention to use purchase accounting in the supervisory conversion. In a paragraph entitled "Amortization of Goodwill," the OGC once again indicated that "[f]or regulatory accounting purposes, the applicants have requested to be able to amortize the resulting goodwill over twenty-five years." The OGC further noted the applicants' "claim .... that this forbearance is necessary for the long-term profitability of the transaction." The OGC did not indicate any opposition to the requested 25–year amortization of goodwill. "We defer to the Office of Regulatory Activities as to the advisability of granting the requested forbearance," OGC wrote, adding that "[w]e have no legal objections."

At the same time the OGC sent its memorandum to the ORA, the following documents were exchanged to set in motion the voluntary supervisory conversion and acquisition: (1) a letter and attached Supervisory Case

Findings from the OGC and ORA to the board of directors of Morristown and Franklin Financial, dated November 21, 1988 ("Approval Letter"); (2) a letter from the Bank Board to Morristown's board of directors, also dated November 21, 1988 ("Forbearance Letter"); and (3) Morristown's May 1988 business plan.

*Approval Letter*

In the Approval Letter OGC and ORA, pursuant to delegated authority from the Bank Board, approved (1) the application of Morristown to convert from a mutual savings and loan to a stock association and change its name to Franklin Federal and (2) the application of Franklin Financial to acquire Franklin Federal. OGC and ORA specifically found that the supervisory conversion and acquisition were "necessary to prevent the probable failure of [Morristown]."

The Approval Letter required that "[p]rior to the consummation of the transaction, [Franklin Financial] shall enter into an agreement with the FSLIC substantially in the form attached hereto as 'Voting and Disposition Rights/Dividend Agreement' .... providing that [Franklin Financial] shall not cause [Franklin Federal] to pay dividends in any fiscal year in excess of the amount permitted by the Pre-nuptial Agreement ...." The Approval Letter further provided that "[p]rior to consummation of the transaction, each shareholder of [Franklin Financial] shall agree in writing with the [Bank Board's] Supervisory Agent to pay [Franklin Financial's] $4.5 million indebtedness on a pro rata basis if [Franklin Financial] is unable and/or unwilling to pay [it]." [2] The Approval Letter also required that "prior to the effective date of the conversion, [Franklin Financial] and its shareholders provide a written agreement .... that [they] will within 30 days of the effective date of the conversion provide any additional capital .... necessary to achieve compliance with 12 C.F.R. § 563b.26(b)(1) (1988) so that [Franklin Federal] will have the greater of (1) three per-

**2.** On January 4, 1989, the Seven Shareholders each signed the required "Shareholder Agreement to Service Holding Company Debt," promising to pay amounts equal to their respective pro rata interests in Franklin Financial. The "Shareholder Agreements" were telefaxed to the Bank Board's Cincinnati office on January 10, 1989.

cent of liabilities, as computed in accordance with GAAP or (2) the Savings Bank's regulatory capital under 12 C.F.R. § 563.13 (1988), as determined from an audited balance sheet as of the date of the conversion which reflects the purchase accounting adjustments." [3]

Finally, the Approval Letter stated that "[p]ursuant to delegated authority to approve the applications noted herein, the Secretary or an Assistant Secretary of the [Bank] Board is hereby directed and authorized to issue to [Morristown] a letter concerning supervisory forbearances (a copy of such letter is in the Minute Exhibit file.)"

### Forbearance Letter

The Forbearance Letter, issued on the same day as the Approval Letter and signed by the Bank Board's Acting Secretary, provided that "[i]n connection with the approval by the [Bank Board] of the Voluntary Supervisory Conversion and acquisition of Morristown .... by Franklin Financial .... the following forbearance is hereby granted.

1. For purposes of reporting to the [Bank] Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Franklin Federal Savings Bank over a period not to exceed 25 years by the straight line method.

The forbearance extended by this letter does not relieve Franklin Federal Savings Bank of its continuing obligations to maintain records of its reserve and regulatory capital condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the [Bank] Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraph 1. Other than the actions to enforce the regulatory requirements waived in accordance with paragraph 1 and the statutory provisions authorizing imposition of the waived requirement, insofar as such requirement is waived, the [Bank] Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Franklin Federal Savings Bank including, without limitation, those under Section 5 of the Home Owners Loan Act of 1933 and Section 406 and 407 of the National Housing Act.

Thus, the accounting forbearance obtained by Franklin Federal allowed it to amortize supervisory goodwill over 25 years using the straight line method. Without this accounting forbearance Franklin Federal would have had to amortize goodwill over "the estimated useful life of the longest live[d] assets that were purchased" using the interest method, as required by SFAS (Statement of Financial Accounting Standards) No. 72, issued by the Financial Accounting Standards Board in 1983. The "estimated useful life" of Morristown's "longest lived" assets, as indicated in its May 1988 business plan, was 17 years.

### Voting and Disposition Rights/Dividend Agreement

On January 12, 1989, in conformance with the Approval Letter of November 21, 1988, Franklin Financial and the FSLIC entered into a Voting and Disposition Rights/Dividend Agreement ("Dividend Agreement"), which was signed on behalf of Franklin Financial by its president, Jean Keener, and on behalf of the Bank Board by its Principal Supervisory Agent in Cincinnati. The "Whereas" clauses of the Dividend Agreement state as follows:

WHEREAS, the Acquiror [Franklin Financial] has filed with the FSLIC the appropriate application (the "Application") under the Savings and Loan Holding Company Act (the "Holding Company Act"), or notice (the "Notice") under the Change in Savings and Loan Control Act (the "Control Act") for approval of its proposed acquisition of control of Morristown Federal Savings and Loan Association, Morristown, Tennessee, to be renamed as Franklin

---

3. This capital infusion agreement, signed by Franklin Financial (through its president, Jean Keener) and the Seven Shareholders, was likewise telefaxed to the Bank Board's Cincinnati office on January 10, 1989.

Federal Savings Bank, (the "Institution"); and

WHEREAS, in reviewing the Application under the Holding Company Act, the FSLIC must make a determination under the standards of 12 U.S.C. 1730(e), and in determining whether to disapprove a Notice under the Control Act, the FSLIC must consider the standards set forth in 12 U.S.C. 1730(q)(7) (and in some cases also 1730(q)(8)); and

WHEREAS, in order to make a determination to approve the subject Application or not disapprove the Notice, pursuant to the applicable standards, the FSLIC requires that the Acquiror enter into this agreement; and

WHEREAS, the Acquiror is willing to enter into this agreement in order that the FSLIC will act favorably upon the Acquiror's Application or Notice;

NOW, THEREFORE, in consideration of the FSLIC acting favorably on the Application or Notice, the Acquiror agrees as follows: ....

Under Section III ("Voting and Disposition Rights") of the Dividend Agreement the parties agreed that:

If the Institution's Regulatory Capital, at the end of any quarter falls below the Regulatory Capital Trigger [defined as 2 % of the Institution's net assets], and such deficiency has not been eliminated within 30 days of the date of the end of such quarter, the FSLIC, acting through the Principal Supervisory Agent [PSA], or the Executive Director of the Office of Regulatory Activities (the "ORA Director"), shall have the right to send a notice (the "Notice") to the Acquiror that the [Bank] Board is invoking the provisions of this section. The Acquiror shall have 10 business days from the date of receipt of the Notice in which to restore the Institution's Regulatory Capital Trigger. If the Institution's Regulatory Capital is not restored to the Regulatory Capital Trigger within such 10 business day period, the PSA or the ORA Director .... shall have the absolute right, in their sole discretion, to: A. Vote, pursuant to the Irrevocable Proxy [executed under section II. of the Dividend Agreement], all of the Shares, including, without limitation, the exercise of such voting power: 1. in favor of, and causing the taking of such steps as may be necessary to consummate, an Extraordinary Transaction [defined as a merger or consolidation or disposition of assets] or the sale of any or all of the Shares, even if no value is received in respect to the Shares or net assets of the Institution; and/or .... B. Dispose of any or all of the Shares, even if no value is received in respect to such securities.

Under Section IV ("Dividends") of the Dividend Agreement the parties agreed that "[t]he Acquiror may not accept from the Institution, nor cause the Institution to pay, any Dividend that would cause the Institution's Regulatory Capital to fall below its Regulatory Capital Requirement." As defined in Sections I.J. and I.K. of the Dividend Agreement, *Regulatory Capital* means regulatory capital defined in accordance with 12 C.F.R. § 561.13 or any successor regulation thereto," while *Regulatory Capital Requirement* means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13, or any successor regulation thereto." Subject to the restrictions and conditions specified in Section IV, Franklin Financial had the right to receive a share of Franklin Federal's profits through the issuance of dividends by Franklin Federal.

The Dividend Agreement contains the following additional definitions: *"Fully Phased–In Capital Requirement* means the Institution's fully phased-in regulatory capital requirement as defined in 12 C.F.R. § 563.13 or any successor regulation." (Sec. I.F.) *"Total Liabilities* means total liabilities as defined in 12 C.F.R. § 563.13(b)(1)(i), or any successor regulation." (Sec.I.P.)

Section VIII. ("Miscellaneous Provisions") of the Dividend Agreement contains the following additional provisions:

This Agreement shall be deemed a contract made under and governed by Federal law. [Sec. VIII.B.]

This Agreement shall be binding upon and inure to the benefit of the parties hereto

and their respective transferees, successors, assigns, heirs, administrators, executors, and trustees. [Sec. VIII.C.]

All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement. [Sec. VIII.D.]

The Supervisory Agent has the authority to act on behalf of the FSLIC in granting approvals, waivers or forbearances, giving notices of default, or taking any other action provided for in this Agreement. [Sec. VIII.H.]

This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof. [Sec. VIII.K.]

Thus, the agreement on the supervisory conversion and acquisition of Morristown by Franklin Financial, and the establishment of the successor thrift, Franklin Federal, was consummated on January 12, 1989. In accordance with the agreement, the Seven Shareholders invested $5 million to purchase all of the stock issued by Franklin Financial. Four prior directors of Morristown owned a collective 51 % of the holding company (George B. McGuffin—29 %, Jean S. Keener—10 %, Richard C. Jessee—10 %, and Charles G. Robinette—2 %), while three new investors owned a collective 49 % (George O. Haggard, Jr.—14.5 %, Benjamin B. Jarnagin—14.5 %, and A. Eugene Jolley—20 %). Jean Keener, who had served as chairman of Morristown's board of directors, continued in that role for Franklin Federal. She also continued to serve as president of Franklin Financial. Charles Robinette, president and CEO of Morristown, continued to serve in that capacity for Franklin Federal. The $5 million initial capitalization of Franklin Financial consisted of $500,000 in cash from the Seven Shareholders' individual assets and a $4.5 million loan from First Tennessee Bank.

Franklin Financial used this infusion to purchase the common stock of Franklin Federal, which thereby became a wholly owned subsidiary of Franklin Financial. As stated in the May 1988 business plan, the Seven Shareholders intended that Franklin Financial would service its $4.5 million debt, which the shareholders had personally guaranteed, with anticipated dividends upstreamed from Franklin Federal. Franklin Financial received no cash assistance from the FSLIC as part of the acquisition.

### After the Transaction

The recapitalized Franklin Federal, under the direction of Robinette, increased its tangible capital every month from January 1989 until the end of that year. Franklin Federal's stated expectation was that it would receive a return of 15 % annually. In March 1989 Franklin Federal paid a dividend to Franklin Financial of $115,000, which Franklin Financial paid in turn to its Seven Shareholders. In June 1989 Franklin Federal paid a dividend to Franklin Financial of $45,000, which Franklin Financial again paid in turn to its Seven Shareholders.

On March 10, 1989, as required by the Approval Letter, an independent auditor's report was produced by Morristown's accounting firm, Pugh & Company, on the financial condition of Franklin Financial and its subsidiaries as of December 31, 1988. According to the auditor's report, Franklin Federal's goodwill utilizing push-down purchase accounting at the time of the conversion (based on fair market value as of December 31, 1988) totaled $9,391,291. In accordance with the Forbearance Letter from the Bank Board, Franklin Federal treated this goodwill as a regulatory asset to be amortized on a straight-line basis over 25 years.

Interoffice correspondence in the Bank Board's Cincinnati office on June 21, 1989 confirmed the Bank Board's understanding of this arrangement. In that correspondence R. Keith Bennett wrote to Lawrence B. Muldoon, Director of Agency Functions, the following:

As a result of the voluntary supervisory conversion in January 1989, Franklin Federal recorded $9.4 million in goodwill..... In conjunction with the Bank Board's approval of the supervisory conversion, Franklin Federal received a forbearance to amortize the goodwill using the straight line method over 25 years.

According to the interoffice correspondence, Franklin Federal's regulatory capital as of March 31, 1989 stood at $6,233,000. However, its "estimated tangible capital" (calculated by subtracting its $9.248 million of goodwill from its GAAP capital of $5.204 million) was a negative $4,044,000.

Meanwhile, the newly-inaugurated Bush administration had introduced a bill (FIRREA) to reform and rehabilitate the thrift industry in February 1989. On July 13, 1989, Mr. Muldoon of the Bank Board's Cincinnati office sent a letter to the Executive Director of ORA discussing the implications for Franklin Federal and other thrifts of the pending legislation, which Congress was getting ready to pass.

As the proposed legislation moves closer to enactment with an increased emphasis on tangible capital, a number of policy questions have arisen .... regarding the effect of a tangible capital requirement on past .... transactions.

For example, in 1988, the Federal Home Loan Bank of Cincinnati's Agency Services department was finally able to persuade Franklin Federal Savings Bank of Morristown, Tennessee, to do a voluntary supervisory conversion from mutual to stock. However, as a result of such transaction, Franklin Federal recorded $9.4 million in goodwill, while raising some $6 million in stock. As you will note on the attached June 21, 1989 memo, this resulted in an institution with regulatory capital of $6.2 million, or 5.9 % of assets; GAAP capital of $5.2 million, or 4.9 % of assets; but tangible capital of –$4 million, or –3.8 % of assets. However, the company has been profitable since the conversion as is shown on the attached three-year trend sheet, with an ROI [return on investment] of 1.4 % annualized for the first quarter of 1989.

&ast; &ast; &ast; &ast; &ast; &ast;

Perhaps [this example] may be helpful to you and the Bank Board in trying to achieve the proper flexibility in the proposed capital requirements.

### FIRREA and its Implementing Regulations

On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989, P.L. No. 101–73, 103 Stat. 183, was enacted. As the Supreme Court noted in *Winstar III, supra,* "FIRREA made enormous changes in the structure of federal thrift regulation by (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation [FDIC]; (3) replacing the Bank Board with the Office of Thrift Supervision (OTS), a Treasury Department office with responsibility for the regulation of all federally insured savings associations; and (4) establishing the Resolution Trust Corporation [RTC] to liquidate or otherwise dispose of certain closed thrifts and their assets." 518 U.S. at 856, 116 S.Ct. 2432. FIRREA mandated that thrifts (1) maintain "tangible capital" in an amount not less than 1.5 % of the institution's assets; (2) maintain "core capital," as defined in the statute, in an amount not less than 3 % of the institution's assets; and (3) maintain "risk-based capital" in an amount not materially less than that required for national banks. 12 U.S.C. § 1464(t)(1)(a). Pursuant to FIRREA supervisory goodwill could not be included at all in satisfying the "tangible capital" requirement, had to be phased out by December 1994 in calculating "core capital," and had to be amortized over a maximum of 20 years in calculating "risk-based capital." 12 U.S.C. § 1464(t)(3)(A), (9)(B) and (C). FIRREA required OTS to enforce sanctions against thrifts that failed to meet the minimum capital standards set forth in the Act.

FIRREA required OTS to promulgate final regulations implementing the Act within 90 days, to become effective within 120 days, of the law's enactment. 12 U.S.C. § 1464(t)(1)(D). On November 8, 1989, interim final regulations were duly published

by OTS in the Federal Register, with the effective date of December 7, 1989. 54 Fed. Reg. 46,845 (1989). OTS then issued an official bulletin on January 9, 1990, advising that it was now "applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances." Office of Thrift Supervision, Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund, Thrift Bulletin No. 38–2, 1990 WL 309397 at *1 (Jan. 9, 1990). Thereafter thrifts could not use any supervisory goodwill in satisfying their "tangible capital" requirements, could count goodwill toward satisfying their "core capital" requirement only in accordance with FIRREA's phase-out schedule, and could count goodwill toward satisfying their "risk-based capital" only in accordance with FIRREA's foreshortened amortization period.

### Aftermath of FIRREA

A report on Franklin Federal by the new FDIC, dated September 5, 1989, indicated that the thrift had unadjusted regulatory capital of $6,100,000. After exclusion of various intangible items, however, including goodwill amounting to $9,141,000, its "adjusted primary capital" was minus $3,866,000. What this FDIC report signaled was that FIRREA, by excluding supervisory goodwill, had turned Franklin Federal's regulatory capital figure from positive to negative, thereby knocking the thrift out of regulatory compliance. On September 7, 1989, Franklin Federal submitted to OTS a Notice of Proposed Dividend of $31,000 to be paid at the end of the month. By letter dated September 28, 1989, however, OTS advised Franklin Federal that it was prohibited from declaring or paying the proposed dividend. Commencing with the debt service for the quarter ending September 30, 1989, the Seven Shareholders serviced Franklin Federal's $4.5 million debt to First Tennessee Bank with personal holdings and other investments. Jarnagin and Jessee liquidated property. Jolley used his savings.

During 1989 and 1990 Franklin Federal sought potential merger partners, without success. In early 1990 Franklin Federal engaged an investment banking firm, First Atlantic Securities, Inc., to help market Franklin Federal. Numerous potential purchasers and investors were contacted, but no offer was received from any of the parties to acquire or merge with Franklin Federal.

In January 1990, in accordance with OTS regulations under FIRREA, Franklin Federal submitted a Capital Plan that projected compliance with the "tangible capital" requirement in the first quarter of 1993, with the "core capital" requirement in the fourth quarter of 1993, and with the "risk-based capital" requirement in the fourth quarter of 1994. In the transmittal letter for the Capital Plan Franklin Federal's lawyer stated:

> With the enactment of FIRREA, [the seven shareholders] found themselves in control of an institution that, under the new law, is subject to being liquidated, merged, or otherwise disposed of in a manner that would completely wipe out the acquiring group's investment, deprive the community of a locally owned financial institution, and potentially result in substantial personal liability for the individuals involved.

In its Capital Plan Franklin Federal further stated:

> Had [Franklin Federal] been liquidated in January 1989, the cost to the tax payer would have been $9,375,000 plus the cost of administration .... Today, barely twelve months later, the negative tangible capital of this institution is at worst a negative $3 million and most probably a negative $2.5 million considering loss reserves. In one year the company has received a $5 million capital infusion and has earned or amortized in good will slightly less than $1.4 million.

On January 12, 1990, representatives of the FDIC and the OTS met with Franklin Federal's Board of Directors. OTS indicated that it was considering termination of Franklin Federal's insurance. According to a memorandum concerning the meeting prepared by FDIC Review Examiner Charles Crumby:

At this point I discussed a third alternative, that being our supervisory tool of termination of insurance. I explained to the board that in the institution's current condition, it represented an undue risk to the Savings Association Insurance Fund. The directors were aghast at the possibility of terminating insurance. Among the options they suggested were assistance and the approval of a capital plan. As to the assistance proposal, I stated to the board that although they could apply if they so desired, it was my opinion that Franklin Federal would not qualify for assistance.

In a letter to Franklin Federal's board of directors on January 19, 1990, James Stringer, OTS District Supervisor, encouraged the Seven Shareholders to increase their investment in the bank:

> We encourage the stockholders to consider additional capital infusions to protect their financial commitment to Franklin [Federal]. We realize that such additional investment is not without risk or frustration given the current environment; however, if the [Bank] Board and existing stockholders believe that Franklin is a viable entity, then additional infusions would seem preferable to possibly forfeiting the sizable investment in the institution.

By letter dated February 19, 1990, Franklin Federal responded to questions concerning its Capital Plan posed in Mr. Stringer's letter. But the Seven Shareholders declined to make additional capital infusions. On March 6, 1990, OTS rejected Franklin Federal's Capital Plan:

> We suggest that the plan be amended to provide for achieving a tangible capital level of at least zero no later than December 31, 1990. This tangible capital improvement could be achieved via gains on the branch sale (as noted in the plan submitted by Franklin), a capital infusion or a combination thereof. An increase in capital to this level during 1990 helps provide comfort that full capital compliance may be achieved within FIRREA timeframes, and it will hopefully provide some margin for error.

In its letter of March 6, 1990, OTS also advised Franklin Federal that it was subject to certain operating restrictions pursuant to Regulatory Bulletin 3a–1 ("RB 3a–1"):

> Note that Franklin [Federal] is an association subject to greater restrictions. Accordingly, Franklin may not make any loans or investments without prior written approval; however, during the period Franklin's capital plan is under review we have determined that Franklin may make the following types of loans and investments without approval:
> — Franklin may make loans on one to four family dwellings within 100 miles of its home office provided that the underwriting is in compliance with Franklin's internal and existing regulatory standards.
> — Franklin may make consumer loans not exceeding $25,000 to customers within 100 miles of its home office provided such loans are underwritten in a safe and sound manner.
> — Franklin may make investments in assets qualifying as liquidity pursuant to 12 CFR § 566.1(g).

In June 1990 Franklin Federal submitted a revised Capital Plan. The Seven Shareholders offered to infuse additional capital into the bank but in return, as indicated in a memorandum from Mr. Robinette to Franklin Federal's board of directors on June 19, 1900, sought assurance from the FDIC "that they would not unilaterally take any other actions as long as our performance was consistent with our agreement .... [since] the Board of Directors had concerns about any new FIRREA type legislation." Robinette stated in his memorandum that the FDIC advised him personally "that the FDIC would not reach such an agreement."

### Litigation in U.S. District Court

On June 21, 1990, Franklin Federal, Franklin Financial, and the Seven Shareholders ("Franklin Plaintiffs") filed a seven-count complaint in the Eastern District of Tennessee. They sought to enjoin the OTS and the FDIC from appointing a conservator or receiver for Franklin Federal and "from taking any action inconsistent with" the parties'

"Conversion Agreement, which permits plaintiffs to treat supervisory goodwill as an asset." In support of the complaint Mr. Robinette submitted an affidavit, also dated June 21, 1990, in which he stated that:

As part of the January 1989 conversion, the seven investors comprising Franklin Financial who agreed to capitalize the institution with their own funds in the amount of $5 million received in return, the Bank Board agreement that Franklin Federal could treat goodwill as an asset, which could be amortized over a 25 year period.

Franklin Financial never would have agreed to the conversion had it not been for this agreement. Both the Bank Board and Franklin Financial recognized at the time that Franklin Financial would not be able to meet the business plan targets unless goodwill could be treated as an asset. This aspect of the conversion was incorporated in our business plan and was indeed the essential term of the agreement .... Supervisory goodwill was, for us, an untouchable, and we believed that the conversion was contingent on this.

The district court issued a temporary restraining order on June 22, 1990, followed by a permanent injunction on July 16, 1990, prohibiting thrift regulators from requiring exclusion of supervisory goodwill from "any and all determinations" of Franklin Federal's capital.

On July 12, 1990, soon after the temporary restraining order was granted and just four days before the permanent injunction was granted, the FDIC noted in an internal memorandum concerning Franklin Federal that:

The Regional Office recently rejected a proposal for capital enhancement submitted by the institution, suggesting an injection of $500,000 by mid-year 1990, with an additional $500,000 injection by 12–31–91. The Regional Office sent the institution a counter proposal of a $1 million injection in increments of $500,000 in June and December, 1990. This proposal was made as a best case scenario, coupled with positive future earning's (*sic*) projections. The association rejected the FDIC's proposal and reiterated their initial proposal along with

their plan to pay dividends. Subsequently, the Regional Office started preparation of a Section 8a Findings and Order [which would terminate FDIC insurance], however on 6/22/90 the institution was granted a temporary restraining order stopping any Section 8a action. The FDIC had not formally initiated proceedings under Section 8a when the temporary restraining order was issued. This order expired on 7–9–90 but was extended to 7–19–90.

On March 12, 1991, in a 2–1 decision, the United States Court of Appeals for the Sixth Circuit reversed the district court's decision. *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision,* 927 F.2d 1332 (6th Cir.1991). The Franklin Plaintiffs petitioned for a writ of certiorari from the Supreme Court and moved the Sixth Circuit to stay its mandate pending final resolution of the appeal. The Sixth Circuit granted the motion to stay on April 8, 1991, thus leaving the district court's permanent injunction in place for the time being. An OTS internal memorandum dated April 18, 1991, indicates that the Chicago Regional Office, prior to the issuance of the stay, had "instructed that the institution be directed to prepare a capital plan .... [and that] formal enforcement action be taken against the institution." As the memorandum noted, however, because of the stay "the injunction precluding enforcement action remains in effect."

On November 4, 1991, the United States Supreme Court denied the Franklin Plaintiffs' petition for a writ of certiorari. *Franklin Federal Savings Bank v. Director, OTS,* 502 U.S. 937, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). The district court injunction was thereupon vacated and the RB3a–1 operating restrictions were again in effect. Franklin Federal was also required to comply with FIRREA's scheduled phase-out of supervisory goodwill from its regulatory capital calculation.

Between November 1989 and April 1992 the Franklin Plaintiffs incurred costs of $334,000.60 in connection with the district court litigation, capital plan submissions and post-FIRREA regulatory advice (of which $14,070.57 were legal fees paid by Franklin

Financial in connection with the district court litigation).

### Subsequent Developments

On January 10, 1992, Franklin Federal submitted another capital plan to the OTS Cincinnati office. The Franklin Plaintiffs then sought and obtained a meeting with the OTS Regional Director in Chicago. On March 27, 1992, Franklin Federal submitted revisions to its January 10, 1992 Capital Plan to the OTS office in Cincinnati. The revised plan required the Seven Shareholders to make two capital infusions, each in the amount of $500,000, within specified time frames. It also called for a public offering or a private placement to sell additional shares of stock in the second quarter of 1993. The revised capital plan contemplated that the Franklin Plaintiffs would raise at least $1.7 million by June 30, 1993, to bring Franklin Federal to a 3 % tangible capital ratio. On June 2, 1992, Franklin Federal executed a Stipulation and Consent to the issuance of a Capital Directive, which was a condition for OTS approval of its revised capital plan. On June 19, 1992, OTS issued the capital directive and approved the plaintiffs' capital plan.

After entry of the capital directive and approval of the capital plan the Franklin Plaintiffs invested additional capital into Franklin Federal, as follows:

(a) On June 26, 1992, the Seven Shareholders, through Franklin Financial, infused additional equity capital into Franklin Federal of $500,000.

(b) On December 15, 1992, the Seven Shareholders, through Franklin Financial, infused additional equity capital into Franklin Federal of $500,000.

(c) In March 1993, Franklin Financial completed a private placement of over 206,000 shares of the FFGI Class A Common Stock to eleven individuals, four of whom (Jolley, Haggard, Jarnagin and Jessee) were existing shareholders and directors. Those shares were sold at $8.50 per share, yielding approximately $1.76 million. Most of that amount—$1,734,457—was injected into Franklin Federal. The four sharehold-

ers in the aggregate were responsible for the purchase of 84,471 shares valued at $718,003.50. The remaining 122,524 shares valued at $1,041,453.50 were purchased by outside investors. The original Seven Shareholders now owned 85.14% of Franklin Federal.

On April 6, 1993, Robinette wrote to the OTS Regional Director in Chicago projecting that the just completed capital infusion would bring Franklin Federal's tangible equity capital to above 4.0 % of adjusted total assets. Robinette requested release from the capital directive, noting that with a public stock offering targeted for mid-May, "it is critical that the offering documents .... are no longer operating pursuant to a capital plan." In a memorandum to the Supervisory Review Committee dated April 16, 1993, Assistant Director Michael Doebereiner recommended release of the capital directive, stating that "[t]he Directive is no longer a necessary enforcement tool to insure capital compliance, particularly in consideration of the upcoming infusion from the public offering." On May 4, 1993, the OTS released Franklin Federal from the capital directive. A letter that day from the OTS Regional Director in Chicago noted that a field office visit on April 28, 1993, confirmed that Franklin Federal's capital exceeded all minimum regulatory requirements. The bank was deemed to be "adequately capitalized" as defined in the FDIC Improvement Act of 1991.

The public stock offering took place in July 1993. Franklin Financial sold 383,173 shares of Class A Common Stock, yielding approximately $3.1 million, of which $2,703,000 was infused into Franklin Federal. The Seven Shareholders purchased an additional 47,029 shares from the public offering at a cost of $399,747. Theirs were designated Class B shares. The remaining shares were purchased by others at a cost of some $2,857,000. As a result, the Seven Shareholders now owned approximately 62.3 % of Franklin Federal. In connection with the 1993 public stock offering, Franklin Financial paid $170,243.88 to Investment Bank Services, $31,277.91 to Bass, Berry & Sims, and $4,320.00 to the OTS.

Thus, Franklin Financial infused a total of $5,437,457 into Franklin Federal after FIR-REA's enactment.

On August 30, 1993, the OTS approved Franklin Financial's application to be released from the Dividend Agreement. Franklin Federal then resumed paying dividends to Franklin Financial. Between December 1993 and June 1996 Franklin Federal paid $1,215,000 in dividends to Franklin Financial, $1,140,000 of which was upstreamed to its shareholders. Of that amount the original Seven Shareholders received $586,758.

Following the capital infusions in 1992 and 1993 Franklin Federal continued to operate as an independent thrift. During this period Franklin Federal paid no income taxes. On July 16, 1996, Robinette advised the OTS Deputy Regional Director in Chicago that Franklin Federal the previous month had charged off the remainder of its supervisory goodwill in the amount of $2,179,899.47.

*Merger with Union Planters Corporation*

On March 4, 1996, Union Planters Corporation ("UPC"), the Franklin Plaintiffs and Franklin Acquisition Corporation ("Franklin Acquisition"), a wholly-owned UPC company, entered into an Agreement and Plan of Merger ("Merger Agreement"). The transaction was structured as a stock-swap. UPC purchased all of Franklin Financial's stock with shares of UPC stock. As part of the transaction Franklin Acquisition was merged with and into Franklin Financial, with Franklin Financial as the surviving entity. Franklin Financial shareholders received some 662,667 shares of UPC common stock.[4] On October 1, 1996, the day the merger closed and the shares were exchanged, UPC common stock closed at $31.25 per share. Therefore, Franklin Financial shareholders received securities worth $20.6 million. Of that total, the shareholder plaintiffs received UPC securities worth $11.4 million. UPC merged Franklin Federal into Bank of East Tennessee, which UPC also owned, and renamed the surviving institution Union Plant-

ers Bank of the Lakeway Region ("UP Lakeway").

The parties also entered into an Escrow Agreement that was incorporated into the Merger Agreement. Under the Escrow Agreement UPC escrowed approximately 10 % of the UPC shares it owed to Class B shareholders as part of the purchase of Franklin Financial. These shares had a value of approximately $2 million at the time of the merger in 1996. The disposition of those escrowed shares is contingent upon the results in this case. The release of the escrowed stock is conditioned on the amount (if any) Franklin Financial and Franklin Federal recover as a result of this lawsuit, minus certain legal expenses. Specifically, the Seven Shareholders receive the entire value of the escrowed stock if Franklin Financial and Franklin Federal recover more than the value of the escrowed stock as of the merger date, March 4, 1996. If the recovery by Franklin Financial and Franklin Federal is less than the value of the escrowed stock on the merger date, the Seven Shareholders receive only a proportionate fraction of the escrowed stock, and the remaining stock would be returned to UPC.

*Instant Litigation*

The Franklin Plaintiffs filed a complaint in this court (alleging breach of contract and unconstitutional taking of a vested contractual right) on October 21, 1992, approximately one year after the Supreme Court declined to hear their appeal of the Sixth Circuit's reversal of the district court's permanent injunction, and little more than a month after the plaintiffs voluntarily dismissed the remaining counts in their district court complaint (on September 14, 1992), without prejudice. The complicated nature of the *Winstar*-related cases has kept this case in limbo for nearly a decade. The case was originally briefed in 1996–97 pursuant to the court's Omnibus Case Management Order for *Winstar*-related cases, rebriefed in 1999–2000 pursuant to the court's Procedural Order No. 1, Master Liti-

---

4. By this time (1996) one of the Seven (Class B) Shareholders, Benjamin Jarnagin, had conveyed half of his 14.5 % ownership share of Franklin Financial (*i.e.*, a 7.25 % interest) to Marjorie C. Jarnagin. So there were now eight Class B shareholders. Marjorie Jarnagin has not been added as a party plaintiff in this action.

gation Plan, and briefed yet again in 2001–02 to take account of developing case law. The case is before the court on plaintiffs' omnibus motion for summary judgment and defendant's motion to dismiss, and alternative motion for summary judgment, on the plaintiffs' breach of contract claim. On February 26, 2002, oral argument was held exclusively on the issue of liability.

## DISCUSSION

### Standards of Review

Defendant bases its motion to dismiss on RCFC 12(b)(1) or RCFC 12(b)(4). The latter rule was redesignated RCFC 12(b)(6) under the revised rules of the U.S. Court of Federal Claims, effective May 1, 2002. Rule 12(b)(1) provides for dismissal of a claim based on a "lack of jurisdiction over the subject matter." Whether a court possesses subject matter jurisdiction depends upon the "court's general power to adjudicate in specific areas of substantive law." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed.Cir. 1999). Rule 12(b)(6) provides for dismissal based on the "failure to state a claim upon which relief can be granted." The court may dismiss a claim under this rule "when the facts asserted by the claimant do not under the law entitle him to a remedy." *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir. 1998).

Defendant's motion to dismiss is frivolous. The court clearly has jurisdiction of this claim under the Tucker Act, which provides, in pertinent part, that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress .... or upon any express or implied contract with the United States ...." 28 U.S.C. § 1491(a) (2000). So RCFC 12(b)(1) provides no basis for dismissal. Furthermore, the facts asserted by the plaintiffs, if true, would certainly entitle them to relief. So RCFC 12(b)(6) is equally infertile as a ground for dismissal.

As for defendant's summary judgment motion, RCFC 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When deciding a motion for summary judgment, the judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Department of Health and Human Services*, 998 F.2d 979, 982 (Fed.Cir.1993), *reh'g denied, en banc suggestion declined* (1993); *Dart Advantage Warehousing, Inc. v. United States*, 52 Fed.Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### Issues

The issues presented by this action are the following:

1. Was there a contract between one or more of the plaintiffs and the Government to treat supervisory goodwill as an intangible asset, amortizable over 25 years, for the purpose of satisfying Franklin Federal's regulatory capital requirements?

2. Was the risk of regulatory change with respect to the treatment of supervisory goodwill allocated to the plaintiffs?

3. Who are the rightful plaintiffs?

### 1.

### Transaction Documents

There is no doubt that the *Dividend Agreement* of January 1989, signed by Franklin Financial (through its president and 10 % shareholder, Jean Keener) and the FSLIC (through the Bank Board's Supervisory Agent in Cincinnati), was a binding contract. The document specifically stated that "*[t]his Agreement shall be deemed a contract made under and governed by Federal law*" (Sec. VIII.B., emphasis added) and "shall be

binding upon and inure to the benefit of the parties hereto ...." (Sec.VIII.C.). The context and purpose of the contract is indicated in the "Whereas" clauses: "[Franklin Financial] has filed with the FSLIC .... for approval of its proposed acquisition .... of Morristown .... to be renamed as Franklin Federal .... [I]n order to make a determination to approve the subject Application .... the FSLIC requires that Franklin Financial enter into this Agreement.... [Franklin Financial] is willing to enter into this Agreement in order that the FSLIC will act favorably upon [its] Application ...." The Dividend Agreement granted the *Principal Supervisory Agent* at the Bank Board's Cincinnati office "*authority to act on behalf of the FSLIC in granting approvals, waivers or forbearances,* giv[e] notices of default, or tak[e] any other action provided for in this Agreement." (Sec. VIII.H., emphasis added.) The Dividend Agreement also contained an integration clause (Sec.VIII.K.) providing that "*[t]his Agreement, together with any understanding agreed to in writing by the parties,* constitutes the entire agreement between the parties and supercedes all prior agreements and understandings of the parties ...." (Sec. VIII.K., emphasis added.)

One such written understanding, within the meaning of Sec. VIII.K., was the *Approval Letter* of November 21, 1988, sent by the Bank Board to Morristown and Franklin Financial. In this letter the Bank Board stated that it had completed its review of Morristown's application "to convert from a federally-chartered mutual savings and loan association .... in a voluntary supervisory conversion ...." whereby the thrift would be acquired by Franklin Financial and renamed Franklin Federal. In a specific "supervisory case finding" the Bank Board (OGC and ORA) "determine[d] that the proposed conversion and acquisition .... are necessary to prevent the probable failure of [Morristown]." Accordingly, the Bank Board approved the application for supervisory conversion, subject to certain conditions. One of the conditions was that "[p]rior to consummation of the transaction, each shareholder of [Franklin Financial] shall agree in writing with the [Bank Board's] Supervisory Agent to pay [Franklin Financial's] $4.5 million indebtedness on a pro rata basis if [Franklin Financial] is unable and/or unwilling to pay its $4.5 million indebtedness." The Approval Letter further provided, under the caption "Supervisory Forbearances," that "*[p]ursuant to delegated authority* to approve the applications noted herein, the Secretary or an Assistant Secretary of the Board is hereby directed and authorized to issue to [Morristown] *a letter concerning supervisory forbearances* ...." (Emphasis added.)

In accordance with the referenced delegated authority, the Bank Board's Acting Secretary issued a *Forbearance Letter* to Morristown the same day, November 21, 1988. As previously noted, the Bank Board granted Franklin Federal "[i]n connection with the approval .... of the Voluntary Supervisory Conversion and acquisition of Morristown .... by Franklin Financial" a forbearance with respect to its regulatory capital requirements. Specifically, the Forbearance Letter provided that "[f]or purposes of reporting to the [Bank] Board, *the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method [i.e., supervisory goodwill] may be amortized by Franklin Federal .... over a period not to exceed 25 years by the straight line method.*" (Emphasis added.) The Forbearance Letter, like the Approval Letter, constitutes a written understanding between the parties, within the meaning of Sec. VIII.K. of the Dividend Agreement.

Thus, both the Approval Letter and the Forbearance Letter were integrated into the Dividend Agreement and comprise part of the contract between the parties. Accordingly, the Bank Board's promise to allow Franklin Federal to amortize its supervisory goodwill over 25 years was a contractual commitment by the Government.

### Defendant's Arguments

▌ Defendant argues that the documents involved in the transaction of 1988–89 are regulatory, not contractual, in nature. Incredibly, defendant contends that the Dividend Agreement was merely a regulatory

instrument, rather than a contract, despite the provision therein (Sec. VIII.B.) expressly stating that it is a contract! ("This Agreement shall be deemed a contract made under and governed by Federal law.") When the language of a contract is clear and unambiguous, the court must give the words their ordinary meaning and may not resort to extrinsic evidence. See *McAbee Construction, Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). When contract language is unambiguous, the court's inquiry is at an end and the plain meaning is controlling. See *Textron Defense Systems v. Widnall,* 143 F.3d 1465, 1469 (Fed.Cir.1998). Thus, the Dividend Agreement is, by its express terms, a contract. The Approval Letter and the Forbearance Letter were both written understandings between the parties within the meaning of Sec. VIII.K. of the Dividend Agreement, and therefore integrated into the contract. ("This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties ....") Accordingly, the court rejects defendant's argument that the transaction documents in this case do not constitute a contract. The plain meaning of the Dividend Agreement is controlling.

■ Defendant argues that no goodwill contract was formed in any event because the Bank Board and the FSLIC lacked authority to enter into any such contract as part of an "unassisted agreement" with the plaintiffs (*i.e.,* an agreement without financial assistance). The Dividend Agreement at issue here was an "unassisted agreement" because it did not involve any financial assistance from the Government. Defendant's argument has no merit. In another *Winstar*-related case, *California Federal Bank, FSB v. United States,* 245 F.3d 1342 (Fed.Cir. 2001) ("*Cal.Fed.II*"), the Federal Circuit ruled as follows:

The fact that Cal Fed did not enter into an assistance agreement by which it would receive direct cash assistance from the FSLIC in the Brentwood and Family transactions (as it did in the Southeastern transaction) is not dispositive of the issue of contract formation between the Government and Cal Fed..... Here, as in *Winstar III,* the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years.[5] *We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [Bank Board] resolutions confirm that intent, the absence of an [assistance agreement] .... should be irrelevant to the finding that a contract existed."* [*Cal. Federal Bank v. United States,] Cal[.] Fed. I,* 39 Fed.Cl. [753] at 773 [1999].

245 F.3d at 1347 (emphasis added). The Federal Circuit went on to state that:

*We have already answered the question of whether the [Bank Board] and the FSLIC have the authority to enter into contracts like these in the affirmative.* [*Winstar Corp. v. United States,* 64 F.3d 1531, 1548 (Fed.Cir.1995) ("*Winstar II*").] Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. *Id.* Further, both the FSLIC and its supervisory agency, the [Bank Board], have had "the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed [by FIRREA]), and to set minimum capital limits on a

---

5. In *Cal. Fed.* only the "Southeastern" transaction (among the three involved in that claim) included an assistance agreement. The "Brentwood" transaction involved an exchange of letters between the plaintiff and the Bank Board without any financial assistance. As in the case at bar, the Bank Board's approval letter was accompanied (one day later) by a forbearance letter granting favorable regulatory treatment of supervisory goodwill. The "Family" transaction involved an Acquisition Agreement without any financial assistance. The Acquisition Agreement contained an article stating that supervisory goodwill would receive favorable regulatory treatment. Two forbearance letters were subsequently issued by the Bank Board confirming the favorable regulatory treatment of supervisory goodwill.

case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed [by FIRREA])." *Id.*

*Id.* at 1348 (emphasis added). Decisions by the U.S. Court of Appeals for the Federal Circuit are binding on this court.

Notwithstanding this controlling case law, defendant argues that the statutes cited by the Federal Circuit in *Cal. Fed. II* did not give the FSLIC authority to enter into an unassisted goodwill contract like that with the Franklin Plaintiffs. Defendant characterizes 12 U.S.C. § 1725(c) as a mere "housekeeping" provision of the FSLIC's "organic" statute (citing the Supreme Court in *Winstar III*, 518 U.S. at 890, 116 S.Ct. 2432) which did not provide the specific authority required for the FSLIC to enter into a goodwill contract. Likewise, 12 U.S.C. § 1729(f) did not provide specific authority for the FSLIC to enter into an unassisted goodwill contract, in defendant's view, because it applied only when the FSLIC determined that financial assistance was necessary to prevent the default of a failing thrift and such financial assistance was provided, accompanied by a written assistance agreement. Nor did the FSLIC derive any contracting authority from 12 U.S.C. § 1730(t)(2), which simply authorized the agency to set minimum capital levels for individual thrifts. The court finds defendant's argumentation unconvincing. The Government's microscopic focus on the particular statutory provisions cited in *Cal Fed. II* cannot detract from the Federal Circuit's ruling, binding in this court under the doctrine of *stare decisis,* that the FSLIC's authority to enter into goodwill contracts did not hinge on whether they were in the context of assisted or unassisted supervisory transactions.

Defendant's "lack of statutory authority" argument is less than compelling in any event. The Government's cavalier dismissal of 12 U.S.C. § 1725(c) as a "housekeeping" statute does not square with the Supreme Court's reference to that statute in *Winstar III.* After declaring that "[t]here is no question .... that the Bank Board and FSLIC had ample statutory authority to .... promise to permit respondents to count supervisory goodwill .... toward regulatory capital and to pay respondents' damages if that per-

formance became impossible," the Supreme Court observed that, "[t]he organic statute creating FSLIC as an arm of the Bank Board, 12 U.S.C. § 1725(c) (1988 ed.) (repealed 1989), generally empowered it 'to make contracts' ...." *Winstar III,* 518 U.S. at 890, 116 S.Ct. 2432. The juxtaposition of those two statements implies a more expansive interpretation by the Supreme Court of the FSLIC's general contracting authority in 12 U.S.C. § 1725(c). The Supreme Court did go on in *Winstar III* to discuss "more specific powers in the context of supervisory mergers" that were delegated to the FSLIC in 12 U.S.C. § 1729(f)(2) ("Assistance to thrift institutions"), but neither the terms of that statutory provision nor the Supreme Court's reading thereof specifically excludes contracting authority to the FSLIC in the context of supervisory transactions without financial assistance. Moreover, the Supreme Court's next statement in *Winstar III* was that "Congress specifically recognized FSLIC's authority to permit thrifts to count goodwill toward capital requirements when it modified the National Housing Act in 1987: 'No provision of this section shall affect the authority of the [FSLIC] to authorize insured institutions to utilize subordinated debt and goodwill in meeting reserve and other regulatory requirements.' 12 U.S.C. § 1730h(d) (1988) (repealed [by FIRREA] in 1989)." *Id.* at 890–91, 116 S.Ct. 2432. 12 U.S.C. § 1730h(d) did not distinguish between goodwill created in assisted transactions and goodwill created in unassisted transactions.

Furthermore, the contract documents in this case, all of which were drafted by the Government, clearly indicate that the Bank Board and FSLIC officials with whom plaintiffs dealt in 1988 and 1989 were authorized to enter into a goodwill contract. The Approval Letter from the Bank Board (signed by OGC and ORA officials in Washington, D.C.), which was sent to Morristown and Franklin Financial on November 21, 1988, provided that *"pursuant to delegated authority* to approve the applications noted herein [for the supervisory conversion and purchase of Morristown by Franklin Financial], the Secretary or an Assistant Secretary of the [Bank] Board is hereby directed and autho-

rized to issue to [Morristown] *a letter concerning supervisory forbearances ....*" (Emphasis added.) In accordance with that delegated authority the Bank Board's Acting Secretary sent the Forbearance Letter to Morristown, also dated November 21, 1988, allowing "the value of any unidentifiable intangible assets resulting from accounting for the acquisition" [*i.e.*, supervisory goodwill] to be amortized by Franklin Federal over 25 years. The Approval Letter also required that "[p]rior to the consummation of the transaction, [Franklin Financial] shall enter into [a Dividend Agreement] with the FSLIC." The Dividend Agreement was duly executed on January 12, 1989 (signed on behalf of the FSLIC by the Bank Board's Supervisory Agent in Cincinnati) and incorporated the Approval Letter and Forbearance Letter by reference. ("This Agreement, *together with any understanding agreed to in writing by the parties,* constitutes the entire agreement between the parties ....") (Emphasis added.) In addition, the Dividend Agreement expressly recognized the Supervisory Agent's own delegated authority to grant forbearances. (*"The Supervisory Agent has the authority* to act on behalf of the FSLIC *in granting* approvals, waivers or *forbearances* ....") (Emphasis added.) Thus, the contractual undertaking between the Franklin Plaintiffs and the Government clearly includes a promise by Bank Board and FSLIC officials, acting with delegated authority, that Franklin Federal could amortize its supervisory goodwill over 25 years.

■ Defendant asserts that the forbearance granted plaintiffs by the Bank Board in its letter of November 21, 1988, did not permit Franklin Federal to count supervisory goodwill as a regulatory capital asset for 25 years. According to defendant, the Forbearance Letter simply permitted Franklin Federal to amortize supervisory goodwill over 25 years, rather than match amortization to the estimated useful life of the acquired liabilities of Morristown (17 years), as required by GAAP (Generally Accepted Accounting Principles). The forbearance made no mention of including supervisory goodwill in Franklin Federal's regulatory net worth. Therefore, Franklin Federal had no contractual right to count supervisory goodwill as a capital asset

for the purpose of satisfying its minimum capital requirement under federal law. This argument is equally unconvincing.

*Winstar* offers a similar factual scenario. Winstar's Assistance Agreement with the FSLIC, like the plaintiffs' Dividend Agreement in the case at bar, did not directly cover the treatment of supervisory goodwill. However, Winstar's Assistance Agreement, like the Dividend Agreement here, contained an integration clause which incorporated contemporaneous documentation into the contract. As the Federal Circuit noted in *Winstar II*, "[a]mong the documents evidencing the government's contractual obligation is a forbearance letter of the Bank Board ...." 64 F.3d at 1544. The pertinent language of the Winstar forbearance letter (aside from the amortization period) is virtually indistinguishable from the Forbearance Letter in this action:

> For purposes of reporting to the [Bank] Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method ....

*Id.* Relying heavily on this forbearance letter, the Federal Circuit went on to find that "the documentation in the Winstar transaction establishes an *express agreement* allowing Winstar to proceed with the merger plan approved by the Bank Board, including the *recording of supervisory goodwill as a capital asset for regulatory capital purposes* to be amortized over 35 years." *Id.* (emphasis added). The Supreme Court agreed in *Winstar III*, stating that "we do not doubt the soundness of the Federal Circuit's finding" as to the nature of the Winstar transaction, and quoting the language from *Winstar II* that there was "an express agreement allowing Winstar .... [to] record [ ] supervisory goodwill as a capital asset for regulatory capital purposes." 518 U.S. at 865–66, 116 S.Ct. 2432. There are no material differences in the substance of the forbearance letters in the Winstar transaction and the case at bar. Nor are there any other material differences between the contract docu-

ments in Winstar and those at issue here with respect to the treatment of supervisory goodwill. See *Winstar Corporation & United Federal Savings Bank v. United States* ("*Winstar I*"), 21 Cl.Ct. 112, 114–15 (1990). Accordingly, with due regard to the Federal Circuit and Supreme Court rulings in *Winstar II* and *Winstar III*, the court finds no merit to defendant's argument that the Forbearance Letter in the case at bar did not allow Franklin Federal to treat supervisory goodwill as a regulatory capital asset for 25 years.

In addition to being at odds with controlling case law from the Federal Circuit and the Supreme Court, defendant's argument conflicts with the documentary evidence in this case. Internal correspondence of federal regulators in 1989—in particular, the interoffice correspondence of the Bank Board's Cincinnati office on June 21, 1989, the letter from the Cincinnati Office (Mr. Muldoon) to ORA on July 13, 1989, and the report on Franklin Federal by the new FDIC, dated September 5, 1989—indicates that the goodwill resulting from the new thrift's supervisory conversion was treated as a regulatory capital asset prior to the enactment of FIRREA. The first two documents, for example, state that Franklin Federal had regulatory capital of $6.2 million as of March 31, 1989, following its supervisory conversion, but tangible capital of minus $4 million. The FDIC report, which came shortly after FIRREA's enactment, stated that Franklin Federal had "unadjusted capital" of $6.1 million, but that after the exclusion of various intangibles, including $9.1 million of goodwill, its "adjusted primary capital" was minus $3.9 million. The only logical interpretation of the foregoing documentation is that Franklin Federal, with the agreement of federal regulators, counted its supervisory goodwill as a capital asset following its supervisory conversion in January 1989, but that FIRREA's passage in August 1989 was putting an end to that.[6]

Defendant's argument also flies in the face of common sense and the realities of the supervisory transactions between S & Ls and the Government throughout the 1980s. Without the inducement of counting supervisory goodwill as a capital asset for regulatory purposes, why would anyone have invested in an ailing thrift facing bankruptcy? As the Supreme Court explained in *Winstar III*, "the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." 518 U.S. at 848, 116 S.Ct. 2432. Another reason for offering to treat supervisory goodwill as regulatory capital was that the FSLIC lacked the resources to wipe out the ailing S & L's debt with cash assistance payments in every supervisory merger. As the Supreme Court further explained in *Winstar III*, "[b]ecause FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations.... Supervisory goodwill was attractive to healthy thrifts [because it] let the acquiring institutions count supervisory goodwill toward their reserve requirements under 12 CFR § 663.13 (1981)." *Id.* at 849–50, 116 S.Ct. 2432. By the time the Franklin Plaintiffs were negotiating their supervisory transaction with federal regulators in 1988–89, supervisory goodwill was the Government's primary "cash substitute" since the federal insurance fund was deeply in debt. As noted earlier in this opinion, the FSLIC was $50 billion in the red by 1988 and the GAO estimated in early 1989 that the FSLIC would need an infusion of $85 billion to cover its obligations and restore its fiscal health.

The Government would have the court ignore this business and historical context

6. Even if the court were not convinced that an express contract existed in the case at bar, the conduct of federal regulators as manifested in this 1989 documentation is strong evidence of a contract implied in fact to treat supervisory goodwill as a regulatory capital asset. An implied-in-fact contract is one "inferred, as a fact, from the conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998).

when viewing the transaction in this case. The deal with the Franklin Plaintiffs was clearly in the Government's interest because Morristown was several million dollars in debt and in danger of going under. As acknowledged in the "Supervisory Case Findings" of the Approval Letter (issued by the Bank Board's OGC and ORA), "the proposed conversion and acquisition are instituted for supervisory reasons and are *necessary to prevent the probable failure of the Institution [Morristown].*" (Emphasis added.) If Morristown had failed, the FSLIC would have been required to draw on the federal insurance fund, already vastly overextended, or make some other financial provision. Instead, the FSLIC was relieved of that burden by a combination of Morristown directors and outside investors who agreed to pump $5 million into the newly-converted thrift. Of that total 51% came from four Morristown directors and 49% came from three outside investors. It is highly improbable that any of them would have invested such large sums in a nearly bankrupt thrift without a substantial inducement from the Government. That inducement, as this court has repeatedly found in other *Winstar*-related cases, was to allow the new thrift to count supervisory goodwill as a regulatory capital asset and to amortize that asset over an extended period of time. Thus, the Seven Shareholders' $5 million investment in Franklin Federal was *not* a rash "gamble," as defendant would have the court believe (Def. Opp. at 22), but a calculated business decision predicated on the Government's *quid pro quo* of allowing the new thrift to count supervisory goodwill as a regulatory capital asset and to amortize that asset over 25 years.

Subsequent to oral argument defendant alerted the court to three new opinions issued by the Court of Federal Claims in *Winstar*-related cases—*Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 202 (2002); *Advance Bank, FSB v. United States,* 52 Fed.Cl. 286 (2002); and *Anchor Savings Bank, FSB. v. United States,* 52 Fed.Cl. 406 (2002)—which arguably supported its contention that there was no goodwill contract in this claim. The court finds all three cases factually distinguishable from

the case at bar. In *Fifth Third* the court denied each party's motion for summary judgment on liability because the record was unclear as to (1) whether the transactional documents involved in the various mergers and acquisitions manifested a mutual intent to enter into a goodwill contract or were merely a regulatory approval exercise, and (2) whether the economic circumstances, policy context, and negotiating history of the transactions indicated a mutual intent to enter into a goodwill contract. In *Advance* the court denied plaintiff's motion for summary judgment because none of the transaction documents in the merger provided clear evidence of an agreement to permit long-term amortization of goodwill or the treatment of goodwill as an asset for regulatory capital purposes. In *Anchor* the court found no goodwill contract, and granted the defendant summary judgment, on one of the transactions involved in the claim since there was neither a forbearance letter nor any other documentary evidence that the Government's involvement in the merger was anything more than regulatory oversight. None of these opinions has any bearing on the case at bar because, as the court has exhaustively discussed, the record amply demonstrates the existence of a goodwill contract.

The court finds, therefore, that the transaction documents in this case, especially when viewed in the context of the many other supervisory transactions which dominated the relationship between the U.S. Government and the thrift industry during the 1980s, established an express contract whereby the Government agreed to treat Franklin Federal's supervisory goodwill, arising as a result of Franklin Financial's purchase of Morristown, as an intangible asset, amortizable over 25 years, for the purpose of satisfying Franklin Federal's regulatory capital requirement.

2.

██ Even if there was a goodwill contract, defendant argues that the plaintiffs promised to bear the risk of regulatory change with respect to the treatment of supervisory goodwill. In other words, plaintiffs assumed the risk of a change in federal regulations, before the end of the 25–year amortization period,

that would preclude Franklin Federal from continuing to count supervisory goodwill as a capital asset in helping to meet its regulatory capital requirement. Defendant points to five provisions in the Dividend Agreement which, in its view, make clear that plaintiffs bore the risk of regulatory change. Four of these provisions are in the definitional section. Thus, "Fully Phased–In Capital Requirement" is defined as Franklin Federal's "fully phased-in regulatory capital requirement as defined in 12 C.F.R. § 563.13 *or any successor regulation.*" (Sec. I.F., emphasis added.) "Regulatory Capital" is defined as "regulatory capital defined in accordance with 12 C.F.R. § 561.13 *or any successor regulation thereto.*" (Sec. I.J., emphasis added.) "Regulatory Capital Requirement" is defined as Franklin Federal's "regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13, *or any successor regulation thereto.*" (Sec. I.K., emphasis added.) "Total Liabilities" is defined as "total liabilities as defined in 12 C.F.R. § 563.13(b)(1)(i), *or any successor regulation.*" (Sec. I.P., emphasis added.) Lastly, Sec. VIII.D. provides that "[a]ll references to regulations of the [Bank] Board or the FSLIC used in this Agreement shall include *any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made* and that such amendments may increase or decrease [Franklin Financial's] obligation under this Agreement." (Emphasis added.)

Defendant asserts that these provisions in the Dividend Agreement reflected the fact that, when the parties were negotiating the supervisory conversion and acquisition of Morristown in 1988 and early 1989, the specter of regulatory change was already in the air. Defendant cites a series of newspaper, magazine, and other media reports, beginning in 1986 and rising in crescendo through early 1989, about the burgeoning crisis in the thrift industry, the need for regulatory change, and the emerging consensus in Congress and the outgoing Reagan Administration that something must be done. Thus, it was public knowledge that regulatory change in the thrift industry was imminent, and the Franklin Plaintiffs were well aware of this

situation when they applied for the supervisory conversion of Morristown in June 1988. According to defendant, therefore, Franklin Federal and its shareholders took a knowing "gamble" when they entered into the Dividend Agreement. (Def. Opp. to Pl. MSJ, filed Sept. 18, 2001, at 22.) Regulatory change could pose serious risks to Franklin Financial's ability to service the $4.5 million bank debt it incurred in acquiring Morristown. Franklin Financial was depending on dividends from Franklin Federal to service the debt, which was personally insured by its shareholders. But the Dividend Agreement prohibited Franklin Federal from paying dividends unless it met its regulatory capital requirement, which was expressly subject to regulatory change. Moreover, the FSLIC could exercise the irrevocable proxy granted to it under Sec. II of the Dividend Agreement and unilaterally sell Franklin Federal if its regulatory capital, also expressly subject to regulatory change, fell below the regulatory capital trigger (defined in Sec. I.L. as 2% of Franklin Federal's net assets) and Franklin Financial failed to infuse additional funds to restore Franklin Federal's regulatory capital to that level.

Defendant may be right in asserting that the growing prospect of regulatory change in the thrift industry was widely known by 1988–89. But its conclusion that the Franklin Plaintiffs assumed the risk of such regulatory change in the Dividend Agreement does not follow. The record in the instant case does not reveal any specific discussions between the Franklin Plaintiffs and government regulators about the prospects of regulatory reform during the negotiation of the supervisory conversion. The fact that the transaction was consummated just seven months before the enactment of FIRREA is hardly persuasive evidence that the Franklin Plaintiffs assumed the risk of regulatory change. The court has already held in numerous other *Winstar*-related cases that supervisory conversions completed in 1988 established valid goodwill contracts (in which the Government promised to count supervisory goodwill as a regulatory capital asset, amortizable over a given number of years) and that these contracts were breached by FIRREA in 1989.

See *Statesman Savings Holding Corporation, et al. v. United States*, 26 Cl.Ct. 904 (1992), *aff'd* in *Winstar II, reh'g en banc*, 64 F.3d 1531 (Fed.Cir.1995), and *Winstar III*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Castle, et al. v. United States*, 42 Fed.Cl. 859 (1999), *vacated in part, aff'd in part, and rev'd in part* (*all on other grounds*) in *Castle et al. v. United States*, 301 F.3d 1328 (Fed.Cir.2002); *Hansen Bancorp, Inc. v. United States*, 49 Fed.Cl. 168 (2001); *Bank United of Texas FSB, et al. v. United States*, 50 Fed.Cl. 645 (2001); *Citizens Federal Bank FSB, et al. v. United States*, 51 Fed.Cl. 682 (2002).

So the time frame of the transaction in the case at bar does not undermine its legal standing as a binding goodwill contract. Moreover, as previously discussed, the Dividend Agreement must be read not in isolation, but in conjunction with the other contract documents it incorporated by reference, including the Forbearance Letter, to determine the parties' respective rights and obligations regarding the regulatory treatment of supervisory goodwill. The court has interpreted the contract documents as forming a binding goodwill contract. Indeed, the very real prospect of regulatory change in 1988 and 1989 lends weight to the court's conclusion that the parties intended, in the Forbearance Letter, to ensure the Franklin Plaintiffs that they would continue to receive favorable regulatory treatment of supervisory goodwill even if the thrift rules did change.

Defendant cites the Eleventh Circuit's decision in *Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991), in further support of its argument that plaintiffs bore the risk of regulatory change. *Guaranty*, like the case at bar, involved a voluntary supervisory conversion in which a mutual thrift was converted to a stock thrift, with a holding company purchasing all of its stock. The *Guaranty* plaintiffs entered into a Regulatory Capital Maintenance/Dividend Agreement (RCM/DA), akin to the Franklin Plaintiffs' Dividend Agreement, with a successor regulation provision identical to that in Sec. VIII.D. of the Franklin Dividend Agreement. Like the Franklin Plaintiffs,

the *Guaranty* plaintiffs received a forbearance letter permitting them to amortize goodwill for 25 years. The language in that letter ("For purposes of reporting to the [Bank] Board, the value of any intangible asset resulting from the application of pushdown accounting in accounting for the purchase may be amortized by Guaranty Federal for a period not to exceed 25 years by the straight-line method.") is virtually identical with that in the Franklin Plaintiffs' Forbearance Letter. In construing these two apparently conflicting contract provisions, the Eleventh Circuit held, in effect, that the successor regulation provision of the RCM/DA trumped the forbearance letter's promise with respect to the regulatory treatment of supervisory goodwill. As the court stated:

> We interpret the forbearance provision to mean that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [*sic*] remained as it was when the contract was signed..... But the agencies, at the same time they made that promise also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment. By signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not. This interpretation .... harmonizes the various provisions of the contract instead of placing them in conflict ....

928 F.2d at 999. Thus, the Eleventh Circuit ruled that, by virtue of the successor regulation provision in the RCM/DA, the risk of regulatory change was allocated to Guaranty. By the same token, defendant argues that the Dividend Agreement in the case at bar allocates the risk of regulatory change to the Franklin Plaintiffs.

In further support of its analysis defendant cites a reference to *Guaranty* by the Supreme Court in *Winstar III*. In discussing the contract terms with respect to regulatory change in that case, the Supreme Court noted that "[t]o be sure, each side could have eliminated any serious contest about the correctness of their interpretive position by using clearer language. See, e.g., *Guaranty Financial Services, Inc. v. Ryan*, 928

F.2d 994, 999–1000 ([11th Cir.] 1991) (finding, *based on very different contract language,* that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift)." 518 U.S. at 869, note 15, 116 S.Ct. 2432 (emphasis added). The "very different contract language" in *Guaranty,* defendant contends, is "indistinguishable" from the language in the Dividend Agreement and Forbearance Letter at issue in this action. Accordingly, these documents should be interpreted, consistent with *Guaranty,* as expressly reserving the right of the Government to change the capital requirements without any liability to Franklin Federal.

The court finds defendant's arguments unconvincing. It must be borne in mind, when considering the Supreme Court's passing reference to *Guaranty* in *Winstar III,* that it appeared only in a footnote, rather than in the body of the opinion. Thus, it could be regarded as classic dictum. Moreover, the footnote was part of the four-justice plurality opinion and does not purport to state a majority view of the Court. The *Guaranty* case was not even mentioned by the other five Justices. Clearly, the Eleventh Circuit's ruling in *Guaranty* was not a central focus of the Supreme Court in deciding *Winstar III.* In short, the reference to *Guaranty* in *Winstar III* was too fleeting and peripheral to be accorded precedential weight.

Since the Supreme Court's decision in *Winstar III* the Court of Federal Claims has been reluctant to embrace *Guaranty* when construing the legal import of "successor regulation" language in *Winstar*-related cases. In *Castle, et al. v. United States, supra,* 42 Fed.Cl. at 863–64, the court had occasion to interpret a "successor regulation" clause in a Regulatory Capital Maintenance Agreement (RCMA) that was identical to that in the Dividend Agreement at issue here. ("All reference to regulations of the [Bank] Board or the FSLIC used in this Agreement shall include any successor regu-

lation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.") In rejecting defendant's argument that *Guaranty* dictated a finding that the risk of regulatory change had been allocated to the plaintiff, the court stated that the "successor regulation" clause must be read "in light of the entire contract." *Id.* at 863. The RCMA contained other provisions dealing specifically with the calculation of regulatory capital which had to be considered as well in order to, in the words of *Guaranty,* "harmonize[ ] the various provisions of the contract instead of placing them in conflict." 928 F.2d at 999. The court analyzed these provisions, found that they could be interpreted together with the "successor regulation" clause in a manner that did not trump the plaintiff's specific contractual rights, and then dismissed defendant's "assumption of the risk" argument in the following language:

> Defendant would have the court accept an interpretation whereby a very specific provision of the agreement setting forth the unique means by which the thrift may meet its capital standards, and designed to induce capital investment in the thrift and to permit the thrift the flexibility in the near term to turn the fortunes of [the acquired, insolvent thrift] around, could be destroyed at any time for any reason. It is unreasonable to believe that anyone .... would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time.

*Castle,* 42 Fed.Cl. at 863–64.[7]

In its recent appellate decision, *Castle, et al. v. United States,* 301 F.3d 1328 (Fed.Cir. 2002), the Federal Circuit reversed the Court of Federal Claims' award of damages to the plaintiffs, but did not address the court's underlying finding of liability based on breach of contract. "Because we find that [plaintiffs] have not established their entitle-

---

**7.** This language echoes that of Justice Scalia in his concurring opinion in *Winstar III:* "If, as the dissent believes, the Government committed only 'to provide [certain] treatment unless and until there is subsequent action,' .... then the Gov-

ernment in effect said 'we promise to regulate in this fashion for as long as we choose to regulate in this fashion'—which is an absolutely classic description of an illusory promise." 518 U.S. at 921, 116 S.Ct. 2432.

ment to damages," the court explained, "we need not determine whether the Court of Federal Claims erred in granting summary judgment of liability." 301 F.3d at 1337. Thus, the Federal Circuit did not disturb this court's ruling with respect to the "successor regulation" clause in the RCMA.[8]

The reasoning of the Court of Federal Claims in *Castle* is equally applicable to the case at bar. This court will not interpret the "successor regulation" provision of the Dividend Agreement in a vacuum, but rather in light of the entire contract. That contract includes the Forbearance Letter which, as previously discussed, permitted plaintiffs (in paragraph 1) to count supervisory goodwill as a capital asset, amortizable over 25 years, for regulatory reporting purposes. Additional language in the Forbearance Letter makes clear that the forbearance with respect to supervisory goodwill was the *only* one being granted by the Bank Board and the FSLIC, which expressly reserved all other regulatory and statutory rights vis-a-vis plaintiffs. ("This letter does not and shall not be construed to constitute forbearance or waiver by the [Bank] Board or the FSLIC with respect to any regulatory or other requirements *other than those encompassed within the preceding paragraph 1. Other than the actions to enforce the regulatory requirements waived in accordance with paragraph 1 and the statutory provisions authorizing imposition of the waived requirement, insofar as such requirement is waived,* the [Bank] Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Franklin Federal ...." (Emphasis added)). Defendant would have the court view this specific contractual forbearance, which is at the heart of the parties' agree-

ment, as subject to expungement by the Government at any time. The court rejects this interpretation.

Rather, the court agrees with the plaintiffs' position that the specific language of the Forbearance Letter, in which the Government agreed to treat supervisory goodwill as a capital asset amortizable over 25 years and expressly waived its right to enforce any regulatory or statutory requirements in conflict therewith, takes precedence over the more general "successor regulation" provision (Sec.VIII.D.) of the Dividend Agreement. This conclusion is consistent with a standard principle of contract construction. As the Federal Circuit has explained, "[w]e read the language of a particular contractual provision in the context of the entire agreement." *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996). "[W]here an agreement contains general and specific provisions which are in any respect inconsistent, 'the provision directed to a particular matter controls over the provision which is general in its terms.'" *Id.* (quoting *Hills Materials Co. v. Rice,* 982 F.2d 514, 517 (Fed.Cir.1992)).

Moreover, the court finds that the Forbearance Letter and the "successor regulation" clause can be interpreted in harmony with one another, giving a reasonable meaning to both provisions. Sec. VIII.D. (a "miscellaneous provision" of the Dividend Agreement) states that "[a]ll references to regulations of the [Bank] Board and the FSLIC in this Agreement .... include any successor regulation .... [which] may increase or decrease [Franklin Financial's] obligation under this Agreement." Because the Forbearance Letter expressly and specifically waives regulations affecting Frank-

---

8. In rejecting the plaintiffs' alternative claim that their contract had been subject to a Fifth Amendment taking, the Federal Circuit went on to implicitly affirm the Court of Federal Claims' finding that the "successor regulation" clause was no bar to a breach of contract remedy in *Castle.*

The plaintiffs received no contractual guarantee that the government would refrain from regulating [the thrift]. At most, the contract promised either to regulate [the thrift] consistently with the contract's terms, or to pay damages for breach. *Cf. Winstar,* 518 U.S. at 919, 116 S.Ct. 2432 (Scalia, J., concurring in judgment) ("Virtually *every* contract operates,

not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance ...."). Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy—injunctive relief—to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages. We agree with the Court of Federal Claims that the plaintiffs retained the full range of remedies associated with any contractual property right they possessed.

301 F.3d at 1342.

lin Federal's treatment of supervisory goodwill, Sec. VIII.D can logically be interpreted to extend the Government's waiver of those regulations to include any "successor regulation" thereto. All other regulations referenced in the Agreement, however, such as the amount of regulatory capital thrifts must maintain, were subject to change. Indeed, as previously noted, the Dividend Agreement specifically defines a number of terms, including "fully phased-in capital requirement," "regulatory capital," "regulatory capital requirement," and "total liabilities," with reference to current *or successor* regulations. Thus, the Forbearance Letter and the "successor regulation" clause of the Dividend Agreement can be read in harmony as a contractual commitment by the Government permitting plaintiffs to count supervisory goodwill as amortizable regulatory capital for 25 years, regardless of any regulatory changes during that time, while preserving the Government's prerogative to change, by regulation, the minimum level of regulatory capital plaintiffs would be required to maintain (or other aspects of the contract subject to Bank Board or FSLIC regulations).

This interpretation of the parties' agreement, which distinguishes their contractual undertaking in regard to the *definition* of regulatory capital from their contractual undertaking in regard to the *level* of regulatory capital, is consistent with the Federal Circuit's ruling in *Winstar II, supra.* As the court explained in that case:

> .... [T]he government argues the Net Worth Maintenance Stipulation signed by Winstar required Winstar to abide by any changes in the law regarding regulatory capital. We agree to the extent that the Stipulation requires Winstar to maintain its capital at *levels* set by the bank regulators .... *This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements* with which it had promised to comply.

*Winstar II,* 64 F.3d at 1544 (emphasis added). The Federal's Circuit's reasoning was echoed by the Supreme Court in *Winstar III:*

> Nothing in the documentation or the circumstances of these transactions [involving the three plaintiffs] purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. 64 F.3d at 1541–42.

*Winstar III,* 518 U.S. at 868, 116 S.Ct. 2432.

In sum, the court is persuaded by the contract documents in this action, the environment in which they were executed, and pertinent case law, that the Franklin Plaintiffs did not bear the risk of regulatory change with respect to the treatment of supervisory goodwill.

**3.**

The next determination the court must make is whether all, or only some, of the plaintiffs are entitled to maintain this action. Defendant argues that the Seven Shareholders and Franklin Financial lack standing in this case—*i.e.*, that Franklin Federal is the only rightful claimant before the court. Defendant also argues that the Escrow Agreement, under which UPC escrowed approximately 10 % of the UPC shares it owed to the Seven Shareholders as a result of the 1996 merger pending the resolution of this litigation, violates the Assignment of Claims Act. Defendant asserts that the Escrow Agreement should be invalidated and the plaintiffs ordered to demonstrate who—among Franklin Financial, Franklin Federal, the Seven Shareholders, and UPC—is entitled to state a claim for the escrowed UPC shares.

*Standing*

 Standing presents a threshold issue of justiciability. See *Pacetti v. United States,* 50 Fed.Cl. 239, 243 (2001). "To have standing in this court on a contract claim,

plaintiff must be in privity of contract with the government." *Id.* at 244. See also *Erickson Air Crane Company v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984). In other words, the plaintiff must have an express or implied in fact contract with the United States. To establish privity of contract between a corporate shareholder and the United States, the shareholder must demonstrate that he or she is owed duties by the Government separate and apart from the duties owed to the corporation. See *Bluebonnet Savings Bank, F.S.B. v. United States,* 43 Fed.Cl. 69, 74 (1999) (reversed on other grounds by the Federal Circuit in *Bluebonnet Savings Bank, F.S.B. et al. v. United States,* 266 F.3d 1348 (Fed.Cir.2001)). Furthermore, to maintain a direct breach of contract claim against the United States (*i.e.,* not a derivative claim on behalf of the corporation), a shareholder must demonstrate a "breach of duty owed to the stockholder personally, and independently of his or her status as a stockholder." *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697 (1980). See also *Suess v. United States,* 33 Fed.Cl. 89, 94 (1995); *David L. Cain, et al. v. United States,* 53 Fed.Cl. 658, 666 (2002).

Defendant does not challenge Franklin Federal's standing in this lawsuit. It does challenge the standing of Franklin Financial and the Seven Shareholders, however, on two grounds: (1) Franklin Financial and the Seven Shareholders seek damages that duplicate those sought by Franklin Federal and (2) neither Franklin Financial nor the Seven Shareholders were parties to a goodwill contract with the Government. With respect to the first ground, defendant charges that the claims of the Franklin Plaintiffs (Franklin Federal for breach of contract, Franklin Financial for diminution of the value of its investment in the thrift, and the Seven Shareholders for the diminution in the value of their investment in the holding company) overlap and could result in multiple recoveries. Recovery by Franklin Federal, the sole legitimate plaintiff in defendant's view, would raise the value of the holding company and compensate the Seven Shareholders for their investment, thereby making all the Franklin Plaintiffs whole. As for the second ground, defendant argues that as a general principle shareholders may only sue directly for injuries if they are parties to the contract or direct third party beneficiaries thereof. Neither the Seven Shareholders nor Franklin Financial (sole shareholder of the former Franklin Federal) is party to any goodwill contract with the Government, defendant asserts, because the Seven Shareholders did not sign any of the purported contract documents and Franklin Financial signed only the Dividend Agreement, which is not a goodwill contract in the Government's view. Only the Forbearance Letter addressed the subject of goodwill, and it was addressed solely to Franklin Federal.

■ The court rejects defendant's arguments and finds that all of the Franklin Plaintiffs have standing in this breach of contract action. In addition to Franklin Federal, whose standing defendant concedes, Franklin Financial has standing by virtue of the fact, among other things, that it was a signatory party (through its president, Jean Keener) of the core contract document in this action, the Dividend Agreement. That instrument is a self-declared "Agreement .... between Franklin Financial .... and the 'FSLIC'." Moreover, Sec. VIII.B. states unambiguously that the Dividend Agreement "shall be deemed a contract made under and governed by Federal Law." Franklin Financial therefore satisfies the fundamental requirement of being in privity of contract with the United States. Defendant's argument that the Dividend Agreement was not a goodwill contract has already been rejected by the court, because the instrument incorporated the Forbearance Letter which made express promises about the regulatory treatment of supervisory goodwill.

■ The Dividend Agreement also incorporated the Approval Letter, which set forth, *inter alia,* certain conditions that the Seven Shareholders had to fulfill, in their individual capacities, before the Bank Board would approve the supervisory conversion and acquisition of Morristown by Franklin Financial. In particular, the Approval Letter specified that the shareholders must personally guar-

antee payment of Franklin Financial's $4.5 million loan from First Tennessee Bank. The Seven Shareholders each signed the required "Shareholder Agreement to Service Holding Company Debt" on January 4, 1989, promising to pay an amount equal to their respective pro rata interests in Franklin Financial if the dividends paid by Franklin Federal to Franklin Financial were insufficient to service the debt. (The loan guarantees supplemented the $500,000 in cash which the Seven Shareholders invested directly in Franklin Financial.) In addition, the Approval Letter required the shareholders (and Franklin Financial) to agree in writing that they would, if necessary, provide additional capital within 30 days of the supervisory conversion to ensure that Franklin Federal complied with federal regulations prescribing minimum capital requirements. This capital infusion agreement was signed by Franklin Financial (through its president, Jean Keener) and the Seven Shareholders on January 10, 1989. Both the capital infusion agreement and the "Shareholder Agreements," discussed above, were telefaxed to the Bank Board on January 10, 1989, two days before the Dividend Agreement took effect.

Thus, the goodwill contract imposed duties on the individual shareholders, and the holding company they owned, for which the shareholders were personally liable. Performance of these duties—in particular the $5 million capital infusion paid and/or personally guaranteed by the Seven Shareholders—provided valuable consideration to the Government. Without this capital infusion the transaction would not have been viable, Morristown may well have gone bankrupt, and the FSLIC may have been obligated to make good on its insurance obligations. As the Forbearance Letter clearly stated: "[T]he undersigned [two Bank Board officials] hereby find and determine that the proposed conversion and acquisition are instituted for supervisory reasons and are *necessary to prevent the probable failure of the Institution [Morristown]*." (Emphasis added.) The financial contributions of the Seven Shareholders were an indispensable part of the transaction because Franklin Financial was a shell, without separate assets. It could not independently service its $4.5 mil-

lion debt to First Tennessee Bank. The Government knew that the Seven Shareholders expected to receive dividends from Franklin Federal (through Franklin Financial) for the purpose of servicing Franklin Financial's debt obligation. Accordingly, the Government owed duties to each of the shareholders to facilitate the payment of dividends so long as Franklin Federal and Franklin Financial met the contractual criteria set forth in the Dividend Agreement.

The Court of Federal Claims encountered a similar shareholder standing issue in *Bluebonnet Savings Bank, F.S.B. et al. v. United States, supra,* 43 Fed.Cl. 69 (1999) The plaintiffs in that action were the thrift (Bluebonnet), the thrift holding company (CFSB), and a shareholder of the holding company (James Fail). As in the case at bar, the Government in *Bluebonnet* moved to dismiss both the shareholder, because he did not sign the contract, as well as the holding company, even though it was a signatory, because it was "merely a shareholder of the thrift." 43 Fed.Cl. at 73. The court rejected defendant's position, stating that "[t]he government's argument—that only Bluebonnet, and neither Mr. Fail nor CFSB, can sue for breach of contract—distorts the essence of the contract." *Id.* "[T]here is no requirement that one be a signatory to the contract," the court observed. *Id.* at 74. "Instead, one must be a party, and both Mr. Fail and CFSB meet that requirement." *Id.*

In *Bluebonnet,* the court found that "regulators induced a private investor to capitalize a newly-formed thrift .... in exchange for substantial cash assistance and certain regulatory forbearances..... Absent the essential agreement between Mr. Fail, CFSB and the government regulators, Bluebonnet is nothing more than a conglomeration of insolvency that is the responsibility of the FSLIC. The glue to this transaction is the agreement of the FSLIC to provide cash assistance and certain forbearances in exchange for Mr. Fail's capital and management commitment." 43 Fed.Cl. at 73. There were two forbearances involved in the transaction, the court explained: (1) a capital forbearance, which "serve[d] as a guaranty of sorts to the investor or investors that its capital infusion is

protected," and (2) a dividend forbearance, which "guarantee[d] that dividends could be paid to the investor of an insolvent institution." *Id.* "[T]he very structure of the transaction was designed to not only make the new entity, Bluebonnet, viable, but to also provide liquidity to CFSB and Mr. Fail, as sole shareholders of the new entity." *Id.* at 74. The court concluded that "Mr. Fail and CFSB, as parties to the contract, have pled direct, non-derivative claims, and have alleged duties owed directly to them outside of their status as shareholders. Thus, they have standing to maintain their claims." *Id.* In *Bluebonnet,* therefore, the court found that, in addition to the thrift, the holding company and the shareholder investor each had standing. The court's ruling was not challenged by the Government in its appeal to the Federal Circuit, which overturned the trial court's damages determination and remanded the case for further proceedings on that issue alone. 266 F.3d 1348 (Fed.Cir. 2001).

As in *Bluebonnet,* the contract documents in the case at bar demonstrate that the transaction was intended not only to save the ailing thrift, but also to provide liquidity to the holding company and its shareholders, who assumed the liabilities of Morristown and infused $5 million into the new thrift, Franklin Federal. Of that sum $500,000 was cash straight from the shareholders, while the other $4.5 million was a bank loan by Franklin Financial personally secured by the shareholders. To service that loan the Seven Shareholders were to receive dividends (through the holding company) from Franklin Federal, whose ability to pay hinged on its being able to count supervisory goodwill as regulatory capital.° When the Government breached the goodwill contract Franklin Federal was no longer permitted to issue dividends to Franklin Financial. As a result the shareholders were obligated, under the terms of the goodwill contract, to service Franklin Financial's $4.5 million bank loan out of their personal assets. The shareholders, therefore, were directly injured by the breach. Defendant makes much of certain factual differences between *Bluebonnet* and the case at bar (including the tired refrain that the court should distinguish between assisted and un-

assisted transactions), but they are unconvincing. The salient fact is that the Seven Shareholders, like the sole shareholder of the holding company in *Bluebonnet,* have asserted "direct, non-derivative claims" based on "duties owed directly to them." 43 Fed.Cl. at 74. Like the shareholder in *Bluebonnet,* therefore, the Seven Shareholders of Franklin Financial were in privity of contract with the United States and have standing to bring this case.

### Assignment of Claims Act

■ The Assignment of Claims Act provides, in relevant part, as follows:

 (a) In this section, "assignment" means (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or (2) the authorization to receive payment for any part of the claim.

 (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

31 U.S.C. § 3727(a) & (b).

Defendant asserts that the Escrow Agreement constituted an "assignment" within the meaning of 31 U.S.C. § 3727(a), because the Class B shareholders (the original Seven Shareholders) assigned part of their claim to UPC. In effect, the Seven Shareholders transferred to UPC the right to receive cash proceeds of those claims, some of the shareholders' right to decide whether to settle and for how much, and the responsibility for funding 50 % of the lawsuit (while retaining a contingent interest in the recovery, some right to decide whether to settle and for how much, and responsibility for funding 50 % of the lawsuit). This assignment was in violation of 31 U.S.C. § 3727(b), defendant asserts, because it was made before the claim was allowed. According to defendant, plaintiffs' conduct implicated one of the purposes of the Assignment of Claims Act to prevent the government from having to "investigat[e] the validity of the alleged assignment," *Spofford v. Kirk,* 97 U.S. 484, 490, 24 L.Ed. 1032 (1878), since government counsel had to travel to Memphis and depose UPC's president,

Jack Moore, to learn more about the Escrow Agreement. In accordance with applicable case law, defendant argues that the Escrow Agreement should be invalidated and the parties returned to the *status quo ante*. *Colonial Navigation Co. v. United States*, 149 Ct.Cl. 242, 247, 181 F.Supp. 237 (1960).

The court does not agree with defendant that the Escrow Agreement has assigned any claim to UPC in violation of the Assignment of Claims Act. Rather, Franklin Financial continues to assert its own claim as a subsidiary of UPC. The Seven Shareholders, represented by independent counsel, also continue to assert their respective individual claims. Though Franklin Federal became part of UP Lakeway by virtue of the 1996 merger, the Assignment of Claims Act does not apply to the claim before this court under the doctrine that "[t]ransfers or assignments occurring by operation of law are exempt from the Act's application." *Johnson Controls World Services, Inc. v. United States*, 44 Fed.Cl. 334, 343 (1999). See also *Patterson v. United States*, 173 Ct.Cl. 819, 823–24, 354 F.2d 327 (1965). As the court further explained in *Johnson Controls*, "[t]ransfers by operation of law include corporate *mergers*, consolidations, and reorganizations." *Id.* (emphasis added). See also *Tuftco Corporation v. United States*, 222 Ct.Cl. 277, 614 F.2d 740, 745 (1980) ("Perhaps the most significant exception to the [Assignment of Claims Act] is when transfer of a claim .... is effected by consolidation or merger to the successor of a claimant corporation.").

In *Dorr–Oliver, Inc. v. United States*, 193 Ct.Cl. 187, 432 F.2d 447 (1970), the Court of Claims held that the plaintiff's agreement to pay a third party 10 % of plaintiff's recovery against the United States did "not violate the anti-assignment statute" because the "agreement simply creates contract rights between plaintiff and [the third party] and does not give [the third party] a lien on any recovery against the United States." 193 Ct.Cl. at 196–97, 432 F.2d 447. That is precisely the situation in the case at bar. The Escrow Agreement does not purport to give UPC a lien on any recovery against the Government, much less an independent right of action against the United States. Any proceeds

UPC may receive as a result of this litigation would be pursuant to a contractual arrangement with the Seven Shareholders. See also *Standard Federal Bank v. United States*, 51 Fed.Cl. 695, 710 (2002) ("An assignment of the proceeds from a claim .... is not an assignment of the claim itself.").

Nor does the Escrow Agreement violate the public policy underlying the Assignment of Claims Act. That policy, as set forth by this court's predecessor in *Kingsbury v. United States*, 215 Ct.Cl. 136, 563 F.2d 1019 (1977), is threefold: (1) "to prevent persons of influence from buying up claims which might then be improperly urged upon Government officials," (2) "to prevent possible multiple payment of claims and avoid the necessity of investigation of alleged assignments by permitting the government to deal only with the original claimant," and (3) "to preserve for the Government defenses and counterclaims which might not be available against an assignee." 563 F.2d at 1024. The first and third criteria are certainly not implicated in this case. Defendant has made no allegation that UPC is a "person of influence" improperly buying up the Seven Shareholders' claims and, as discussed above, the Escrow Agreement does not give UPC any lien against the Government. Nor has defendant asserted that any government defenses or counterclaims are imperiled by the Escrow Agreement. As for the second criterion, there is no danger of a multiple payment of claims because UPC is not a party to this action and asserts no claim against the Government. As for defendant's trip to Memphis to take the deposition of UPC's president, Jack Moore, that action was not unduly prejudicial or burdensome to the Government. Whatever the deposition produced in terms of evidence, moreover, it obviously did not persuade the Government to implead UPC in this case.

Defendant cites this court's ruling in *Westfed Holdings, Inc., et al. v. United States*, 52 Fed.Cl. 135 (2002), as "strongly support[ing] its argument that the claim-splitting in this case violated the Assignment of Claims Act." (Defendant's notice of supplemental authority, April 18, 2002, at 1.) In *Westfed* (another *Winstar*-related case) a thrift holding compa-

ny brought a breach of contract suit against the United States and thereafter partially assigned the claim to Dennis I. Simon (an employee of Price Waterhouse LLP). The court made Simon an additional party plaintiff, as assignee of Westfed's assets for the benefit of its creditors. The assignment of assets provided that any excess of proceeds after the payment of administrative expenses and the discharge of Westfed's debts would be paid to Westfed. A dispute later arose as to whether Simon or PricewaterhouseCoopers LLP (successor to Price Waterhouse LLP) was the true assignee for the benefit of Westfed's creditors. The Government argued that the "transfer by operation of law" exception to the Assignment of Claims Act was inapplicable to a partial assignment of this nature. The court, after noting that "the purposes of the Act .... include protecting the United States by preventing the multiplication of claims against it and avoiding the possibility of payment to the wrong person," 52 Fed.Cl. at 142–43 (citations omitted), agreed with the Government that "applying the exception to the Act in this case would run counter to [such] purposes ...."
*Id.* at 143. As the court went on to explain:

> To be sure, the Act permits assignment of "any part of a claim against the United States Government or of an interest in the claim," see 31 U.S.C. § 3727(a)(1) (2001), but the partial assignments that the Act permits are for allowed claims, not pending claims. See 31 U.S.C. § 3727(b) (2001). Partial assignments of claims that have already been allowed, and for which a warrant for payment has already been issued, do not pose the same danger of complex litigation as partial assignments of pending claims. The conflict over whether Mr. Simon or PWC [PricewaterhouseCoopers] is the true assignee of Westfed's claims seems illustrative of difficulties that the Act seeks to forestall.

*Id.* The court concluded that "the assignment of Westfed's claim to Dennis I. Simon as the assignee for the benefit of Westfed's creditors was in violation of the Assignment of Claims Act and was therefore void." *Id.* at 144. As a result, Simon had no interest in the case and the court proceeded to dismiss his claim for lack of standing.

In defendant's view, *Westfed* supports its argument that the Seven Shareholders have partially assigned their claims to UPC in violation of the Assignment of Claims Act. The court does not agree. Defendant overlooks a fundamental factual difference between the two cases. In *Westfed* there was undeniably a partial assignment of the original claim, resulting in an additional plaintiff and a dispute as to the true assignee. In the case at bar, however, there was no such assignment of a claim. The parties now before the court are the same as those who brought the suit in 1992. As previously discussed, the Escrow Agreement was a contractual arrangement between the Franklin Plaintiffs and UPC. It was designed to ensure that the Seven Shareholders receive full value from the merger with UPC by providing them with additional UPC stock based on the net recovery in this litigation, if any, of Franklin Federal and Franklin Financial. The Escrow Agreement did not assign to UPC any claims the shareholders had against the United States. Nor did it give UPC a lien on any recovery against the United States. UPC has not become a party plaintiff as a result of the Escrow Agreement.

Defendant argues that if the court accepts the validity of the Escrow Agreement, as it has, then the real party in interest in this action is UPC, which should be substituted as the plaintiff in this action under Rule 17(a) of this court. "Every action shall be prosecuted in the name of the real party in interest." RCFC 17(a). The identification of the "real party in interest" is based upon a "totality of the facts" test. *Wall Industries, Inc. v. United States*, 15 Cl.Ct. 796, 804 (1988), *aff'd*, 883 F.2d 1027 (Fed.Cir.1989). Salient facts in the case at bar include the following: (1) Franklin Financial and Franklin Federal were acquired by UPC in 1996, (2) Franklin Federal no longer exists since it was merged into a UPC subsidiary, (3) UPC pays 50 % of the expenses of this litigation, and (4) the proceeds of any award will be paid to UPC (though passed on to the Seven Shareholders in the form of UPC stock of equivalent value). The totality of these facts,

in defendant's opinion, show that UPC is the "real party in interest."

The court does not agree with defendant's conclusion that UPC is the real party in interest. The plaintiffs before the court are Franklin Financial, which though owned by UPC is still a corporate entity of its own, the Seven Shareholders individually, and Franklin Federal, whose successor in interest is UP Lakeway.[9] As the court has not yet made any damages determinations, it is unclear at this stage of the proceedings which of these entities or individuals, if any, may be entitled to awards. At oral argument plaintiffs assured the court that they seek no double or overlapping recovery in this action. They simply wished to assert their respective claims and promised, in the event that damages are allowed, to assist the Government in determining the rightful awardee(s).

As plaintiffs pointed out in a post-hearing brief, this approach was adopted by the court in another *Winstar*-related case, *Bank United of Texas FSB, et al. v. United States*, 50 Fed.Cl. 645 (2001). (Plaintiff's response to defendant's notice of supplemental authority, April 29, 2002, at 4 (note 5).) In *Bank United* the name of the plaintiff thrift had been changed and the two holding company plaintiffs had been consolidated and renamed subsequent to the filing of the complaint. In addition, the consolidated corporation was involved in a merger transaction whose outcome was unknown to the court. While determining that the plaintiffs were entitled to damages for breach of contract, the court withheld entry of judgment "pending notification from the parties concerning the precise entity or entities in whose favor judgment should be entered." 50 Fed.Cl. at 665. To the extent there may be any confusion as to which of the party plaintiffs would be entitled to receive an award in the case at bar, *Bank United* is a good model for the court to follow.

4.

Since the court has found that the Franklin Plaintiffs had an express goodwill contract that was breached by the Government, their alternative claim, set forth in the complaint, that they had a vested contractual right that was taken for public use without just compensation, in violation of the Fifth Amendment, need not be addressed. (This claim was not briefed in the motions currently before the court.) The court notes, however, that the Federal Circuit as part of its recent opinion in *Castle, et. al. v. United States, supra,* affirmed a ruling by the Court of Federal Claims that the enactment of FIRREA did not effect a taking of the plaintiffs' contract because "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed." 301 F.3d at 1342. See also *Sun Oil Company v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978).

**CONCLUSION**

Based on the foregoing discussion, the court holds that the Government had an express contract with the plaintiffs to treat Franklin Federal's supervisory goodwill resulting from the supervisory conversion and acquisition of Morristown as a capital asset amortizable over 25 years for regulatory capital purposes, and that the Government breached this contract by enacting FIRREA which prematurely ended this favorable accounting practice.

Defendant's motion to dismiss the complaint, or alternatively for summary judgment, is DENIED.

---

**9.** None of the parties has filed a motion for substitution of parties under Rule 25(c) of the court ("Transfer of Interest"), which permits, but does not mandate, substitution in this situation. "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." RCFC 25(c). "Rule 25(c) does not require that anything be done after an interest has been transferred." *Luxliner P.L. Export Company v. RDI/Luxliner, Inc.,* 13 F.3d 69, 71

(3d Cir.1993) (referring to identical rule in the Federal Rules of Civil Procedure). A "transfer of interest" in a corporate context occurs when one corporation becomes the successor to another by merger or other acquisition of the interest the original corporate party had in the lawsuit. See *Froning's, Inc. v. Johnston Feed Service, Inc.,* 568 F.2d 108, 110 (8th Cir.1978) (assignment of claims); *DeVilliers v. Atlas Corp.,* 360 F.2d 292, 297 (10th Cir.1966) (merger); *Hazeltine Corp. v. Kirkpatrick,* 165 F.2d 683, 685–86 (3d Cir.1948) (transfer of patents).

Plaintiff's omnibus motion for summary judgment is GRANTED on the issue of liability.

*Further Proceedings*

In looking ahead to the damages phase of this action, the court notes that both sides have already filed and discussed in their briefs multiple expert opinion reports. Court decisions heretofore on damages issues in other *Winstar*-related cases, particularly by the Federal Circuit, suggest that plaintiffs' expectations with respect to recovery are often unduly high. With this observation in mind, the court advises the parties that it is available for a conference with counsel, telephonically or in chambers, on the damages issues should they feel it might be helpful in limiting further proceedings or encouraging settlement.

The court hereby orders the parties, after consultation with one another, to contact chambers no later than September 17, 2002, for the purpose of discussing further proceedings in this case.

IT IS SO ORDERED.